# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

RUBEN PEREZ GOMEZ,
Defendant and Appellant.

S087773

Los Angeles County Superior Court
BA156930

November 29, 2018

Justice Liu filed the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Lui concurred.

PEOPLE v. GOMEZ

S087773

Opinion of the Court by Liu, J.

Defendant Ruben Perez Gomez was sentenced to death in 2000 for the first degree murders of Rajendra Patel and Raul Luna, Jr.  He was also sentenced to life in prison without the possibility of parole for the double murder of Robert Acosta and Robert Dunton.  This appeal is automatic.  (Pen. Code, § 1239, subd. (b); all undesignated statutory references are to this code.) We affirm the judgment in its entirety.

## I.   FACTS

In an amended information filed on July 7, 1998, in Los Angeles County Superior Court, the district attorney charged Gomez with five counts of first degree murder (§ 187, subd. (a)), six counts of second degree robbery (§ 211), and one count of kidnapping (§ 207).  The amended information alleged personal firearm use enhancements in connection with each count. (Former §§ 1203.06, subd. (a)(1), 12022.5, subd. (a).)  The amended information also alleged multiple-murder, robbery, and kidnapping special circumstances.  (§ 190.2, subd. (a)(3), (17).)

The prosecution withdrew one of the robbery counts before trial, and the trial court dismissed one of the five remaining counts of robbery during trial.  A jury convicted Gomez of four counts of first degree murder, two counts of second degree robbery, and one count of kidnapping.  The jury found true the special circumstance allegation of multiple murder as well as

1

the special circumstance allegations of robbery and kidnapping in connection with the Patel murder. Although the jury convicted Gomez of the first degree murder of Luna, it acquitted him of the robbery of Luna and the associated robbery special circumstance and personal firearm use enhancement. The jury was unable to reach a verdict on the murder and robbery counts relating to the separate killing of Jesus Escareno; the trial court declared a mistrial on these counts, which the prosecution subsequently dismissed pursuant to section 1385.

The penalty phase took place before the same jury. After two days of deliberations, the jury returned a verdict of death for the murders of Luna and Patel, and of life without parole for the murders of Acosta and Dunton.

## A. Guilt Phase

### 1. Prosecution Evidence

#### a. The Salcedo Robbery

Gomez and Xavier Salcedo knew each other from "growing up." Salcedo testified that Gomez came to his home sometime in February 1997 and told Salcedo that he was out of jail and asked for money. Salcedo denied having any money. About two weeks later, around 11:00 p.m. on February 25, Gomez returned with two other men. Salcedo, his girlfriend, Silvia, and their three children were home. Salcedo had about $10,000 in cash in his bedroom closet.

Salcedo testified that he heard someone knock on the back door and that he told them to come around to the front. When Salcedo opened the front door, Gomez and a second man forced their way into the house while a third man remained standing in the open doorway. Gomez told Salcedo, "I want to talk to you,

sit the fuck down." Gomez sat on the couch next to Salcedo, and the second man stood facing them about four feet away. Gomez's two confederates held their hands in their pockets, giving Salcedo the impression that they had guns. Gomez had a gun tucked into his waistband.

Gomez said that Salcedo had "disrespected him" when he came to Salcedo's house two weeks earlier to borrow money. Gomez pulled the gun from his waistband, pointed it at Salcedo, and told Salcedo to take off his jewelry. Salcedo handed over his gold bracelet, necklace, ring, and watch. Gomez told Salcedo to close the bedroom door so they could talk. Salcedo went to close the door and told Silvia, who was in the bedroom, that he was being robbed. Silvia testified that she called 911 from the bedroom.

Salcedo further testified that he went back to the living room, where Gomez told him to "sit down" and to "shut up." Gomez pointed the gun at Salcedo, asked if he had any money, and told him to "go get it." Salcedo went to his bedroom, grabbed about $5,000, handed a gun to Silvia, and told her "if they come in here, protect yourself." Salcedo returned to the hallway, gave Gomez the money, and the two went back into the living room. Salcedo pleaded with Gomez to give back the jewelry because it had been a gift from his parents. Gomez handed his gun to Salcedo while the second man in the living room looked on, but Salcedo handed it back and said, "I don't want any problems." Gomez gave back the jewelry, and the three men left with the cash. Salcedo locked the door, turned off the lights, and went back into the bedroom where Silvia was still on the phone with a 911 operator.

Salcedo told Silvia to "grab the kids and let's go," but the three men returned before Salcedo and his family could leave. The men demanded that Salcedo open the door or they would shoot though the walls. Silvia called 911 a second time from the bedroom. Salcedo looked out the window and saw a friend walk up to the house. The friend spoke with the three men. The men started knocking on the door again, and Gomez threatened to shoot through the walls. The police arrived; Gomez and the others ran off around the back.

b.  The Patel Murder

In the early morning of May 27, 1997, Detective Sal La Barbera received an assignment to investigate the "northbound Terminal Island Freeway on-ramp between Anaheim and PCH." When La Barbera arrived, the scene was already contained by police officers, who had found a body on the shoulder of the on-ramp, apparently shot and stabbed. Officers found blood about 75 feet north of the victim's body. Two days later, after recovering a missing persons flier on a telephone pole in Torrance, La Barbera identified the victim as Rajendra Patel. The officer spoke with Patel's family and then verified Patel's identity by checking his thumb print against the victim's.

A county medical examiner testified that Patel was shot once in the back of his head at close range, with the tip of the gun barrel making contact with his head. The medical examiner also testified that Patel received stab wounds in the face and neck, and one particularly deep stab wound in the chest. The medical examiner attributed Patel's death to the gunshot wound and the deep stab wound. He further opined that Patel would have been able to walk or run 75 to 90 feet after receiving the deep stab wound, but not after receiving the gunshot wound.

Patel was last seen on May 25, 1997, around 9:00 p.m. at his home in La Palma. The victim's son testified that his father left home in his white Toyota Camry, wearing a bracelet, a gold watch, and a chain. On May 28, 1997, a police officer discovered Patel's car after being directed via radio call to locate a stolen vehicle in an alley in San Pedro. The interior of the car was found burned. A police department criminalist compared DNA extracted from blood found in the trunk of the Camry to Patel's DNA and testified that the blood "could have come from Mr. Patel or any other individual with the same combination of genetic marker types." The criminalist further testified that the relevant combination of genetic marker types "occurs approximately one in 60,000 individuals, so it's fairly rare in the general population."

Witness No. 1 testified that Gomez had asked him to burn the white Camry. (Before trial, the prosecutor asked that Witness No. 1 and three other witnesses not be named in the record, although their real names were used during the proceedings. We likewise refer to these witnesses without naming them.) Witness No. 1 complied with Gomez's request because they "were tight." He took the car to an alley and then poured alcohol on the upholstery so that the vehicle's interior would ignite when he threw a lit rag into the car. Witness No. 1 believed the car was a "murder car" because Gomez had told him to "check the trunk good to make sure there wasn't no blood in it." Witness No. 1 also testified that three or four days before Gomez asked him to burn the car, Gomez said, "I hated to kill that guy because he had balls. He said 'if you're going to do it, go ahead and shoot me, motherfucker.'" According to Witness No. 1, Gomez later put "a hit" out on him "for not burning the white car completely" because Gomez "was worried about his

fingerprints." Witness No. 1 testified that Gomez brought Patel's watch and bracelet to Robert Dunton's house at least one or two days before he burned Patel's car.

Witness No. 3 testified that Gomez brought Patel's jewelry to Witness No. 3's residence in Wilmington, where her husband traded narcotics for the jewelry. During the transaction, Gomez told Witness No. 3 and her husband that the jewelry was "from this Mexican man I have in the trunk of the car I just killed." Witness No. 3 observed that a white car was parked in the driveway while Gomez was at her home. Witness No. 3 later pawned the watch and bracelet in Las Vegas, Nevada, on June 5, 1997. The police collected Witness No. 3's pawn slip when she was arrested for an unrelated crime on July 2, 1997. Police investigators subsequently recovered Patel's jewelry from the Las Vegas pawn shop.

The police also found three expended .40-caliber cartridge casings when investigating the crime scene on May 27, 1997. One of the cartridges was located between 90 and 100 feet from the body, the second "just a few feet shorter . . . probably only a three or four foot difference," and the third within three feet of the body. These casings were later matched to a Smith and Wesson .40-caliber stainless steel semiautomatic handgun given to a police officer by Angel Rodriguez on June 8, 1997. During trial, a firearm examiner testified that his forensic analysis of the .40-caliber handgun revealed that it was the source of the expended casings found near Patel's body. Witness No. 1 later identified the same handgun as the one Gomez carried "when he first started coming around [Dunton's] house."

c. The Escareno Murder

On the morning of June 9, 1997, Detective Debra Winter and her partner arrived at a shopping center on Western Avenue in San Pedro to investigate a homicide. Winter testified that she saw the "body of a male Hispanic, approximately 30 years of age, lying face down" in an alcove behind the shopping center. The body had been discovered by a maintenance worker earlier that morning. The maintenance worker testified that "there was no body" when he arrived for his shift at 5:30 a.m., but that he discovered the body when he returned to the area between 7:30 and 8:00 a.m.

There was brain tissue on the victim's suit and on the ground immediately surrounding the body. A fragment of glass was also recovered from the victim's hair at the crime scene. A county medical examiner testified that the victim had been killed by a shotgun blast to the head from a distance of about one or two feet.

No jewelry was found on the victim's body, but there were indentations on the victim's fingers where he had been wearing rings. One of the victim's pockets was turned out, and Winter concluded that someone had rifled through it. Although there was no wallet or identification upon the victim's person, the police discovered a business card for the restaurant Los Tres Cochinitos in the victim's right front pocket. Workers at Los Tres Cochinitos examined a photograph of the victim and identified him as a regular customer who bussed tables at another restaurant. Upon visiting the victim's workplace, Winter was able to identify the victim as Jesus Escareno.

On June 11, 1997, two days after Escareno's body was discovered, his car was found in San Pedro. Winter testified that

the car's roof was dented from pellets that had been shot into the vehicle. Blood and brain matter were found between the passenger seat and the passenger side door. A vanity mirror in the visor had been shattered by a shotgun blast, which was consistent with the glass found in Escareno's hair at the crime scene. Winter testified that in her opinion Escareno's death did not occur where the car was found and that someone had driven the car following Escareno's homicide.

Diana Paul, a criminalist with the Los Angeles Police Department, performed a "bullet path determination" analysis on Escareno's car. Paul examined the vehicle and found projectiles "consistent with a type of shot shell pellet known as double aught buck . . . typical of a 12 gauge shotgun." Paul testified as to his finding that the projectiles traveled "upward and from the driver's side toward the passenger side." Paul further testified that this finding was consistent with a shotgun having been fired through the open driver's side window and that her findings "could be consistent with only one shot" having been fired from the shotgun.

Maria Rosales, Escareno's sister, lived in Wilmington with her husband, her children, and Escareno. According to Rosales, Escareno normally worked as a busboy until 10:30 p.m. on Sundays. After work, he typically went out to Los Tres Cochinitos "to chat with his friends." Escareno always carried a wallet. Rosales testified that on Sunday, June 8, 1997, Escareno came home after work, "slept for a while at home," then went out. Teresa Nava, a waitress at Los Tres Cochinitos, confirmed that Escareno had been at the restaurant on June 9 and that he left the establishment around 4:10 a.m. That morning, Rosales "awoke with the sound of a gunshot," which "coincided with the time [Escareno] usually arrived" at home.

Deanna Gallardo lived in the apartment directly upstairs from Escareno and Rosales. Gallardo was sleeping in bed when a gunshot sounded from "right in front of the apartment complex" at 4:42 a.m. on June 9. Gallardo and her husband ran to the front window where she saw "the red glare of the brakes" and heard "the skidding of a car." Pero Hererra, who lived about four houses down from Escareno, was in his kitchen early that morning getting a drink of water when he also heard a gunshot. In an interview with Winter on July 2, 1997, Hererra said that from his kitchen window he had seen a car park alongside what looked like his neighbor's car, that he saw a flash "coming from inside," and that he heard a blast from a large gun or shotgun.

Around this time, Witness No. 1 was living in San Pedro at Robert Dunton's house. Witness No. 1 met Gomez through Dunton. Witness No. 1 and Gomez became friends and were "pretty tight for a while." Witness No. 1 testified that he was driving Gomez around one evening and that Gomez "was looking for somebody to rob." Gomez had in his possession a cut-down, break-open shotgun nicknamed "shorty" that belonged to Witness No. 1 and Dunton. They drove from San Pedro to Wilmington.

Upon passing a bar, Gomez asked Witness No. 1, "Did you see that guy, with all them rings on his finger[s]?" The man with the rings drove off in a Ford Thunderbird; Witness No. 1 and Gomez followed him. After losing track of the car, the pair located it in front of an apartment complex in Wilmington. They pulled up next to the Thunderbird, and Gomez started talking to the driver in Spanish.

According to Witness No. 1, the driver of the Thunderbird seemed tipsy because he was laughing a lot. Gomez told him, "I

9

got mucho huevos and mucho corazon." Witness No. 1 explained this meant he had a lot of balls and a lot of heart. As the driver of the Thunderbird laughed, Gomez lifted the shotgun and fired one shot. Witness No. 1 testified that the driver "suddenly disappeared." Gomez then told Witness No. 1 to drive the Thunderbird back to San Pedro so they could remove the rings from the victim's fingers. When Witness No. 1 entered the driver's side of the Thunderbird, he noticed that the victim's head was over by the passenger door and his left foot was up behind the steering wheel. Gomez drove off while Witness No. 1 moved the victim's foot from behind the steering wheel. Witness No. 1 drove the Thunderbird a couple of blocks to a hamburger stand, parked it in a dirt lot, took the man's wallet, and walked back to Dunton's house in San Pedro. Witness No. 1 spent $10 of the victim's money on heroin before he arrived at Dunton's house. When Dunton learned of this, he told Witness No. 1 that he "didn't follow orders." Witness No. 1 gave Gomez the victim's remaining money, about $70.

Witness No. 1 went back to the car; the body and keys were still inside. He drove the Thunderbird to an alley in San Pedro about a half block from Dunton's house. Witness No. 1 returned to the house, and Gomez ordered him to retrieve the dead man's jewelry. Witness No. 1 took rings and two watches off the body and brought them to Gomez. Gomez gave the items to Dunton, who told him that the items were costume jewelry. The jewelry was thrown away.

Gomez subsequently told Witness No. 1 to dispose of the car and the body. Witness No. 1 testified that he drove the Thunderbird to the Park Plaza shopping center and left the body near two dumpsters "where somebody could find him." He then drove the car back to an open garage in an alley near Dunton's

house. Witness No. 1 parked the car, walked down the alley, took his blood-stained shirt off and threw it in a garbage can, and walked back to Dunton's house.

Later, after Gomez had been taken into custody, Winter and her partner paid him a visit "to determine the tattoos that he had." Winter testified that she asked Gomez some routine questions as part of the booking procedure. According to Winter, Gomez made several statements that were not responsive to her questions. For example, he opined that the police "must be very busy" because "things were crazy" in the Harbor area lately. Gomez "talked about a guy up on Western, his head being shot off," and he mentioned "a couple of guys that were shot and brains were splattered all over the place." Gomez said these individuals couldn't be identified and that their wallets were missing. Winter further testified that she had not released information to the press about Escareno's wallet being missing.

d. The Luna Murder

At approximately 1:20 a.m. on June 10, 1997, Detective Jeffrey Lancaster was dispatched to a shooting at a residence in Torrance. Lancaster arrived to find the body of Raul Luna, Jr. "laying adjacent to a walkway that runs from the sidewalk to the front porch" of the house. He observed a gunshot wound on the left rear portion of Luna's head but no other wounds. A live, 12-gauge shotgun cartridge was found about 15 feet east of Luna's body. Officers also located "a clear plastic baggie with a kind of white brown substance" near Luna's knee, which was later identified as methamphetamine. Upon searching the residence, officers discovered more methamphetamine, an assault rifle, money, and "some other ammunition, .45 caliber." Raul's father later testified that Raul sold illegal drugs.

11

A county medical examiner performed an autopsy on Luna's body and determined that the cause of death was a gunshot wound to the head fired from about six to 12 inches away. During trial, another medical examiner testified that photos of the decedent revealed a circular wound with tearing into and behind the left ear. The medical examiner described "fully burnt gunpowder" scattered around the skin near the shotgun wound hole and noted damage to the skin in the same area from the burnt gunpowder.

Rudy Luna, Raul's brother, testified that at approximately midnight on June 9, 1997, he arrived at the home he shared with Raul, another brother named Andy, his sister-in-law Alice, and his nephew Andrew. Rudy lay down to go to bed at 12:06 a.m. A few minutes later, he heard a "loud, muffled engine . . . sounding rough like a truck" before hearing a car pull up to the middle of the street directly in front of the Luna residence. Approximately three to five minutes later, Rudy heard "rustle noises" in front of his bedroom window, so he looked out. Rudy explained that he "didn't see anything, so [he] laid back down, and then a minute after that [he] heard someone say, 'there's somebody in there, there's someone in there.'" After a couple minutes, Rudy heard the same voice say "he's here"; he then heard his brother Raul say "oh, shit." Rudy next heard a gunshot and immediately lay down onto his bedroom floor. Eventually, Rudy walked to his kitchen window, which faces the front of the house. He did not see anybody but heard "a muffled garbled cough" and walked outside to find Raul "lying flat on his back bleeding from the head."

Charles Orr lived on the same street as the Luna family. On the night in question, Orr was working on his computer shortly after midnight when he heard "what sounded like an

explosion." Orr assumed that the sound was a malfunctioning electrical transformer at the school down the street. "All of a sudden," Orr heard running and "a kind of rattling noise," so he looked out of his window to see someone "about [Orr's] size" running eastbound in a "heavy footed" way. Orr left his house and walked down the street to follow the runner but did not see anyone.

Around the same time, William Owens, a federal customs officer, was smoking a cigar across the street from his apartment, less than a mile east of the Luna residence. That night, Owens saw a man running eastbound toward him. The man asked Owens to "give him a ride to his girlfriend's," but Owens declined. The man continued to run eastbound. Owens soon called the Torrance Police Department and reported "hearing [a] gunshot about 1:00 a.m." During the trial, Owens identified the running man as Ruben Gomez.

Officer Steve Fletcher testified that upon canvassing the crime scene for possible witnesses, he spotted a silvery white and black Oldsmobile from the mid-1980s parked about a hundred yards south of the Luna residence. Fletcher noticed that the car windows were rolled down, the keys were still in the ignition, the hood was warm to the touch, and the tires were wet, "appearing as they just had been driven up through the water that was in the gutter." Officers found a radio and a white plastic bag containing seven live 12-gauge shotgun rounds in the backseat of the vehicle.

The vehicle was towed to an impound yard later that day, where Officer Brooke Mc Millan took additional photographs of the vehicle's interior. Mc Millan fingerprinted both the interior and exterior of the car and collected 34 lifts. Two prints lifted

from the exterior surface of the passenger door belonged to a woman named Maria Baca. One print lifted from the rearview mirror matched Baca while the other matched another woman named Sandra Ruvalcaba. Seven prints from the driver's window exterior matched Gomez and one matched Ruvalcaba. Finally, three prints from the driver's door exterior matched Gomez.

While the investigation into Luna's death was ongoing, officers investigating the murders of Robert Acosta and Robert Dunton recovered a cellphone at Dunton's house in San Pedro. Witness No. 1 testified that Gomez had brought the phone into Dunton's house. The police were unable to identify fingerprints from the lifts taken from the cellular phone. But when Lancaster asked Luna's father to identify the phone, he successfully matched the phone's serial number with the serial number found on the phone's packaging, which was stored at the Lunas' residence.

At trial, a custodian of records for AirTouch Cellular testified about 10 phone calls made after midnight from the telephone number registered to Raul Luna. Four calls were made to unknown numbers. Two calls were made to cab companies, one to a hotel in Wilmington, and one to Dunton. As discussed further below, Gomez had been staying at Dunton's home "off and on for about a month."

### e. The Acosta and Dunton Murders

Around 3:48 a.m. on July 1, 1997, police officers responded to a 911 call regarding a possible assault with a deadly weapon at 332 West O'Farrell Street in San Pedro. After knocking on the front door and receiving no response, and after trying unsuccessfully to open the front door, the officers accessed the home through a back door and discovered dead bodies inside.

Detective Olivia Joya and her partner Detective Scott Masterson were assigned to investigate the matter around 4:20 a.m. They found the body of Robert Acosta on the living room floor and the body of Robert Dunton on a living room sofa. Masterson testified that Acosta's head was a "very short distance" from the front door. Joya testified that four spent Remington shotgun shell casings, a bag of shotgun shells, the sawed-off wood stock of a shotgun, a metal tube, drugs and drug paraphernalia, and a cellphone were all recovered from the scene. As noted above, the cellphone was later traced to Raul Luna.

An autopsy of Acosta's body determined that he had been killed by a single shotgun wound to the neck and that the shotgun had been placed "at the throat in some contact" with the neck. Dunton's autopsy revealed that he had been killed by a shotgun wound to the back of the head, although Dunton received three shotgun wounds in total.

Manuel Hernandez, who lived in the residence immediately to the west of Dunton's home, told investigators that he heard what sounded like three gunshots at about 3:15 a.m. on July 1, 1997. When he peeked outside of his window, Hernandez saw that Dunton's house was dark and that one man came out of the back door and ran down a walkway toward

O'Farrell Street.  The man was between five feet, six inches to five feet, eight inches tall; the parties stipulated that Gomez is six feet, two inches tall and that Arthur Grajeda, Gomez's codefendant as to the Acosta and Dunton charges, is five feet, eight inches to five feet, ten inches tall.  Hernandez then heard a car start nearby.  He subsequently noticed someone turn on the lights in the Dunton residence and say "oh, my god" before leaving the house through the back door.

Witness No. 1 testified that he was present in the home when Acosta and Dunton were shot and that he was the person who placed the 911 call.  Witness No. 1 had known Acosta and Dunton since approximately 1975.  For several months prior to the killings, Witness No. 1 lived with Dunton at Dunton's residence on O'Farrell Street.  Witness No. 1 paid Dunton some rent and helped him by "working the door" and letting people into the home to buy drugs from Dunton.  Dunton weighed around 500 pounds and had difficulty getting up from the couch to answer the door.  Witness No. 1 first met Gomez about a month before Acosta and Dunton were killed, when Gomez came to the house to buy drugs.  Gomez and Dunton became friends, and Gomez began napping and showering at Dunton's house within a week or two of his first visit.

During the week before Acosta and Dunton were shot, a man who went by "Boxer" came to Dunton's house two days in a row.  On the first visit, Boxer complained, "You ain't paying your taxes and they're getting on me because I'm not doing my job."  The next day, Boxer returned with his girlfriend and another person.  He threatened Gomez with a machete while the other two held him back.  He then took $100 and a small chrome handgun from Gomez.  When Gomez complained about the gun, Boxer said, "Well, I'll give it back to you."  Gomez then called

16

someone in Wilmington and said he "need[ed] a gun, any kind of gun" and insisted that it was a matter of "life or death." Someone brought over a shotgun, and Gomez and Witness No. 1 cut six inches from the barrel and cut the stock off to make it easier to conceal.

The night before Acosta and Dunton's murder, Witness No. 1 and Gomez drove to a location in Wilmington known as "the third world" or "the junk yard" where drug dealing took place. Witness No. 1 flashed some money and offered to buy crack cocaine from a drug dealer. When the dealer presented the drugs, Gomez drew the cut-down shotgun and took the drugs without paying.

Gomez and Witness No. 1 subsequently drove back to Dunton's house. Gomez said to Witness No. 1, "They sent somebody to fuck [Dunton] and [Acosta] up." Upon entering Dunton's house, the pair found Acosta, Dunton, and Grajeda seated inside. Gomez and Witness No. 1 sat down at a table; the cut-down shotgun was placed on the table. Grajeda was seated on a small couch facing Dunton and held a different shotgun — the weapon that Witness No. 1 and Dunton referred to as "shorty." Dunton sat on a large couch facing the door, and Acosta was standing near the door. Witness No. 1 subsequently left the room to prepare some crystal methamphetamine in his bedroom.

From his bedroom, Witness No. 1 heard Dunton say, "If I got to go, I'm going to go like a man." Grajeda said, "You know the rules," and Gomez added, "Yeah, forward and backward." Gomez then said, "Don't point that at me. I don't like people pointing things at me." Thereafter, Witness No. 1 heard about four gunshots, running footsteps, and a bump against the

washing machine near the back door. Witness No. 1 went into the living room and saw Acosta lying by the front door and Dunton seated on the couch with his head to the side.

Witness No. 1 went out the back door and rode his bicycle toward a convenience store to call 911. On the way, he passed a business where his friend worked, and he went in and called 911. He then continued to the convenience store. Witness No. 1 testified that he was afraid to go back to Dunton's house because he "figured they would . . . come back and get me." But during an interview with Detective Joya and Detective Masterson on July 2, 1997, Witness No. 1 said that he had gone out to get something to eat and had come home to find the bodies. In court, Witness No. 1 acknowledged this discrepancy and explained: "Because both of them was gone and I was there . . . I was afraid it might look like I did it."

Witness No. 2 testified that he had known Grajeda, who was dating Witness No. 2's niece, for about four to five years. Witness No. 2 had also known Dunton and Acosta for about 30 years; Dunton lived behind Witness No. 2's mother's house. The day before Acosta and Dunton were shot, Witness No. 2 went to Donald Jauez's house around 3:30 or 4:00 p.m. Grajeda was already there, along with four to six other people, having drinks. Witness No. 2 testified that he heard Grajeda say that Gomez was supposed to be collecting taxes for the Mexican Mafia and that "[Dunton] wasn't paying up, [Gomez] wasn't paying up." Witness No. 2 recalled Grajeda saying he would "go over there and take care of [Gomez]."

Grajeda then asked Witness No. 2 to drive him to Dunton's house because Grajeda "wanted to go check out the place." Witness No. 2 complied. They arrived at Dunton's house around

4:30 or 5:00 p.m. Gomez answered the door and they went inside. Witness No. 1, Witness No. 2, Gomez, Grajeda, and Dunton were all present. Witness No. 2 and Grajeda stayed 20 or 30 minutes and made small talk. Gomez was "nervous" and "was walking back and forth." Witness No. 2, suspecting that another person may have been in the bedroom, said to Grajeda, "Let's get out of here. It don't look right."

Grajeda and Gomez walked outside, followed by Witness No. 2. Grajeda and Gomez went over to a vehicle and talked for a few minutes. Acosta arrived, greeted them, and went inside the house. Witness No. 2 drove Grajeda back to Jauez's house and dropped him off around 5:30 p.m. During the drive, Grajeda asked Witness No. 2 to come back at 8:00 p.m. to pick him up and drive him back to Dunton's house. Grajeda told Witness No. 2 that he intended to kill Gomez and possibly Dunton if Dunton "didn't pay up his taxes." Witness No. 2 agreed to return at 8:00 p.m.

Around 6:00 p.m., Witness No. 2 went to his mother's apartment. He told his girlfriend that Grajeda was going to call and instructed her to say that Witness No. 2 was asleep and that she would not wake him. Witness No. 2 did not see Grajeda again until about two days after Acosta and Dunton had been killed. Witness No. 2 told Grajeda that "[Acosta] and [Dunton] got killed," and Grajeda said that he "did it."

Witness No. 4, Gomez's cousin, testified that she saw Gomez on July 2, 1997, for the first time in about eight years. Sometime in the late afternoon, Gomez knocked on the door to her home in Long Beach and said that he needed a place to stay. He was carrying a bag and "kind of a big gun" that resembled the shotgun that he and Witness No. 1 had cut down and

removed the stock from. Witness No. 4 subsequently left Gomez in her house and walked to her friend's house, where she eventually called the police.

Around 3:00 or 3:30 a.m., Gomez was arrested at Witness No. 4's home without incident. Upon searching the residence, officers discovered the cut-down shotgun. Three of four fingerprints lifted from the shotgun matched Gomez. Daniel Rubin, a criminalist with the Los Angeles Police Department's Firearms Analyst Unit, testified that four spent cartridges discovered at Dunton's house were fired by the shotgun confiscated from Gomez during his arrest, and that one live round recovered from Dunton's house was "the type of shot cartridge that could be loaded in and fired by" the shotgun. Rubin further noted that a metal tube found at Dunton's residence "could have been a part of the barrel of [the] shotgun." On July 7, 1997, detectives acting on information provided by Witness No. 1 recovered a cut-off shotgun stock from a trashcan in Dunton's kitchen.

Witness No. 5, Acosta's wife, testified that Gomez called her after his arrest and asked her to come visit him at the county jail. At the jail, Gomez denied killing Acosta and Dunton, and told Witness No. 5 that he knew "that he had left fingerprints all over the house and even fingerprints on [Dunton's] face, and he even kissed him." Gomez also acknowledged that he was "the last person there" when Acosta and Dunton were killed.

Witness No. 5 further testified that she found a note between the pages of a Bible five days after Acosta's death. The handwritten note was signed by Acosta in his full name and his street name "Spider." She testified that she and Acosta "always" left notes for each other, but that Acosta had never left a note

for her signed with his full name. Witness No. 5 said that the note "meant something serious," so she turned it over to the detectives investigating Acosta's death. The note read as follows: "6-30.97 [¶] Tuesday morning [¶] Monday nite 1.20 [¶] Went to meet [¶] Shady La Rana [¶] don't like the [¶] meeting at Big Huero [¶] Robert Acosta [¶] Spider." ("Shady La Rana" was Grajeda's nickname, and "Big Huero" referred to Dunton.)

The prosecution also presented expert testimony from Sergeant Richard Valdemar about the history and practices of the Mexican Mafia. Valdemar recounted some of his observations from surveilling Mexican Mafia meetings, including the fact that murder was a primary topic of conversation. He further stated that the Mexican Mafia had a "reputation for seeking out witnesses and killing them" and that loyal Mexican Mafia members "would use any means possible to delay, obstruct or reverse any kind of a criminal prosecution against its members." Moreover, after viewing Gomez's tattoos, Valdemar testified that Gomez was "a member of the East Side Wilmas gang, Ghost Town Locos, which is a subset, and surrenos." He had previously stated "[t]hat members of the East Side Wilmas gang . . . align themselves with the Mexican Mafia."

Valdemar also explained that individuals can be placed "on a green light list" and that "gang members have a green light or the authorization to assault and murder whoever is on that list." Valdemar noted that "all dope dealers who operate in the area controlled by the street gangs that are controlled by [the Mexican Mafia] pay taxes," and agreed with the prosecution that a "Hispanic street gang member who by reason of his tattoos was professing allegiance to [the Mexican Mafia]" and "was robbing dope dealers in San Pedro and Wilmington and not

21

turning over those proceeds to [the Mexican Mafia]" would likely be placed on the green light list and specifically designated to be killed. He further explained that someone on the green light list might be given an assignment for a "suicide run" where the individual murders someone else on behalf of the Mexican Mafia so as to be removed from the list. Valdemar also noted that the Mexican Mafia often "used someone close to the victim to either approach them or actually carry out the murder."

During a break in Valdemar's testimony, one of the jurors sent a note to the trial court judge, that read as follows: "Judge, I have a question! What about jury members. Are we at risk?" Additionally, at the end of guilt phase deliberations, the jury sent a note signed by the foreperson to the court, stating that the jurors were "concerned about possible harassment or problems after we are dismissed once the verdicts are read." The trial court subsequently rearranged the jurors' parking and provided for them to be escorted to their cars.

### 2. *Defense Evidence*

#### a. The Patel Murder

When Gomez was arrested on July 2, 1997, the police did not find any .40-caliber pistols on his person. Nor did the police recover such handguns at the crime scenes of the Luna, Escareno, or Acosta and Dunton murders. Besides the three shell casings of the .40-caliber pistol found near Patel's body, officers also discovered a disposable lighter from which no prints of Gomez were recovered.

During the investigation, Detective La Barbera had experts take foot impressions from the ground. La Barbera testified that after having learned that officers from Long Beach

and the California Highway Patrol had already been to the crime scene, he originally chose not to have the castings analyzed, believing the prints belonged to the police officers present at the scene. La Barbera later had the plaster casts and photographs of the shoe prints at the crime scene compared to boots confiscated from Gomez during his arrest even though "these boots . . . did not or could not have made the shoe or boot impressions located at the scene."

Additionally, La Barbera had requested fingerprint, serology, and arson experts to conduct an investigation of Patel's car. None of the fingerprints lifted from the vehicle were linked to Gomez. The serologist was unable to match the blood in Patel's car to Gomez. Officers also recovered various personal items from the car, including a flashlight that did not belong to Patel and other "trace evidence" such as a rope and bungee cords, none of which "c[a]me back to Ruben Gomez." The police did not find knives, scissors, or shears in the trunk of Patel's car.

b. The Escareno Murder

The defense introduced a local newspaper article on the Patel murder, dated May 27, 1997, indicating that no identification was found on the body. Detective Winter confirmed that the Escareno murder was also "covered in their local paper." The defense also introduced two newspaper articles concerning the Escareno homicide that were included in the murder book prepared by the detectives that investigated Escareno's murder. Defense Exhibit L, dated June 18, 1997, and entitled "A Gruesome Discovery in SP Alley," recounted the discovery of Escareno's car and described the blood and brain matter found in the car. Defense Exhibit M, dated June 10, 1997, and entitled "Man Found Slain at SP Shopping Center,"

stated that a victim was found with a massive gunshot wound to the head in a shopping center on Western Avenue, that jewelry had been taken from both hands, and that robbery appeared to be a motive. The article also stated that the victim was killed at the shopping center.

The defense recalled Detective Winter, who testified that she had interviewed Witness No. 1 on July 24, 1997. During the interview, Witness No. 1 said that Gomez "always drove." Witness No. 1 would ask Gomez for permission to carry the shotgun because Gomez was driving, and sometimes Gomez would let him. Witness No. 1 also told Winter that Dunton would give "some of the jewelry that would come into the house" to "some of the females that would come around." Witness No. 1 described jewelry that Dunton had given to some girls, and Winter indicated in her testimony that the description sounded like Escareno's jewelry. He also indicated that Gomez had several guns, including a single shot 12-gauge shotgun and a pump shotgun. Winter also interviewed Witness No. 1 on August 20, 1997. Witness No. 1 told Winter that he had been involved in the Escareno murder and that he was with Gomez at the time.

### c. The Luna Murder

During trial, Rudy Luna testified that he did not recognize the voice he heard outside his bedroom window. Rudy acknowledged that he personally knew Gomez prior to Raul's death.

Detective Lancaster later directed officers to compare the boots taken from Gomez to the plaster shoe casts made at the Luna crime scene. There was "no similarity at all" between the boots and the casts, which appeared to have been made by an

"athletic type of shoe." Nor did the casts taken from the crime scene produce any evidence significant to the investigation.

Charles Orr, one of the prosecution's witnesses, described the man he saw running shortly after the shooting as "dark-skinned but not Black." During trial, Orr did not characterize Gomez as having dark skin.

William Owens, another one of the prosecution's witnesses who had "five or six seconds" of interaction with the running man, testified that the man seemed Central American and had "a deep heavy Spanish or Hispanic accent." Owens estimated that the man stood around "five-nine, five-ten," weighed "maybe 180, 200" pounds, had a "light complexion" and "a facial structure . . . from [the] Central America region," and spoke with a "heavy Spanish or Hispanic accent." Owens further reported that the running man wore jeans and a red and blue nylon jacket. Owens did not notice any tattoo markings but described the runner's hairstyle as a "marine-type" "crewcut" and said that the runner had a trimmed, "medium mustache."

Lancaster showed Owens a six-pack of photos that contained a picture of Gomez. Lancaster did not have Owens circle, date, and sign the photograph, as he customarily did to verify the identification because Lancaster did not feel Owens had accurately identified the individual who had committed the crime. Lancaster testified that Owens "never conclusively indicated that [the photograph] was [of] the suspect," only that Owens indicated "he somewhat resembled the suspect." Owens claimed to have identified the runner with "75 to 85 percent accuracy." During trial, Owens pointed to Gomez in the courtroom when asked to identify the running man.

Wilcox testified that Gomez's prints did not match the latent prints lifted from the Oldsmobile at the crime scene. Wilcox further testified that it is generally impossible to "put a time date as to the appearance of that fingerprint on that particular object . . . unless there is some type of outside specific force that acts on that fingerprint." Further, all six of the fingerprint lifts taken from the cellphone recovered by the police were "badly smeared or basically not of sufficient quality to do the latent print comparison." Wilcox was not directed to perform fingerprint analysis on lifts taken from other surfaces besides the vehicle and cellphone.

At trial, Lancaster testified that the Oldsmobile was not registered to Gomez. He also acknowledged that prints lifted from the radio found inside the vehicle, prints from the baggie found near Luna's body, prints from an ATM card found near Luna's body, and prints lifted from a gold chain and cross around Luna's neck did not match Gomez's prints.

d. The Acosta and Dunton Murders

The defense recalled Detective Joya, who testified that the cut-off barrel and wood stock of the shotgun linked to the Acosta and Dunton murders were sent to the crime lab, but she could not recall if any of the prints matched Gomez. Joya also testified that she interviewed Witness No. 1 on July 15, 1997, and August 20, 1997. During the July 15 interview, Witness No. 1 told Joya "[Gomez] had told him that they're going to send someone over to fuck up [Dunton] and [Acosta]." In the interview on August 20, Witness No. 1 told Joya "that [Gomez] told him that they — that they have their orders for [Dunton] and [Acosta]." Witness No. 1 did not indicate to Joya that by using the term

"they," Gomez was referring to himself. Joya further testified that "they" was a reference to a group of people.

The defense also recalled Detective Winter, who testified that she interviewed Witness No. 1 on July 24, 1997. During the interview, Witness No. 1 said that Gomez "always drove." Witness No. 1 would ask Gomez for permission to carry the shotgun, because Gomez was driving, and that sometimes Gomez would let him. During this same interview, Witness No. 1 told Winter that Dunton asked him to get rid of Boxer.

## B. Penalty Phase

### 1. Prosecution Evidence

The prosecution's aggravation case consisted of testimony concerning Gomez's prior felony convictions and violent criminal activity. The prosecution first presented evidence that Gomez had been convicted of a 1991 robbery. The victim, Jorge Lucho, testified that Gomez approached him when he was walking home late at night. Gomez threatened Lucho with a pointed screwdriver and demanded his wallet. Lucho turned over the wallet, which contained only one dollar; Gomez said Lucho "surely was carrying more money and that [Lucho] should go with him to the alley to try and get some more." At that point, Lucho was able to run away, but he heard Gomez threaten to kill him if he didn't give any more money. Police officers thereafter discovered Gomez hiding behind a mattress in a metal shed in the backyard of a house several blocks from where he had confronted Lucho. Upon arresting Gomez, the police officers found a "homemade metal sharp object" on Gomez's person. The arresting officer testified that Gomez "had a bewildered look, eyes wide open." Gomez was transported to the

general hospital, where he was diagnosed as being under the influence of an opiate.

The prosecution next introduced evidence that while incarcerated for the 1991 robbery and a separate drug charge, Gomez was convicted of assault and possession of a deadly weapon.

Finally, the prosecution presented evidence relating to several violent incidents that occurred when Gomez was in custody awaiting trial in the instant case. Deputy Sheriff Chad Millan testified that in June 1998, he escorted Gomez to the hallway to search him for hidden contraband or weapons. Gomez "was instructed to strip out of his underwear," was then "waist chained," and "asked to do a squat down and a cough too and release anything that might be secreted in his anus." Gomez initially did not comply and then pulled an object from "between his buttocks." Fearing that the object was a weapon, Gomez was ordered to drop the object; when Gomez refused to do so, Millan sprayed him with pepper spray. Gomez turned away, began peeling paper "covering off what seemed like the blade," and ran down the hallway. Millan followed him and confronted him, kicking him in the back of the head. Gomez turned around, said "fuck you, punk," and stabbed Millan three times in the rib and knee with a shank.

Deputy Sheriff Timothy Vanderleek testified that he responded to a disturbance in Gomez's cell in November 1999. When he entered the cell, he had liquid that smelled like urine thrown on his face. Deputy Sheriff Frank Montoya testified that he had several violent interactions with Gomez in December 1999, while Gomez was jailed during his trial. Montoya encountered Gomez walking back from court carrying a large

bag of candy, which was not authorized because Gomez had been placed in the "high security discipline" cell. Montoya confronted Gomez and advised him that he could not possess the candy until he "gets out of discipline"; this caused Gomez to get angry and start shouting profanities. When Montoya attempted to grab the bag, Gomez turned around and head butted him. After Gomez was brought to the ground, Gomez said, "You fucked up, Montoya. You fucked up. I'm going to kill you. I'm going to kill you and I'm going to kill every deputy here."

The next day, Montoya let Gomez out of the locked shower area and asked him to show Montoya his hands. Montoya testified that Gomez "thrust" his hand "through the bars toward [Montoya's] office," and that Gomez was holding "a plastic handled comb with the teeth cut out, and there was a razor fixed to it, like a slashing instrument." Gomez was unable to reach Montoya with his weapon, so he "started breaking the razor and the plastic comb into little pieces and threw it down the shower drain." As he did that, Gomez said, "fuck you . . . I'm going to kill you. I might have missed you this time, or I'll get you later or I'll get some other deputy that's slower." Montoya testified at trial that he maintained daily contact with Gomez after these two incidents; although Gomez continued to threaten Montoya, he did not try to attack him physically again. Another deputy at the jail, Keith Holly, testified that he went to Gomez's cell to inform Gomez that he had been found guilty of various offenses in violation of jail disciplinary rules, and that Gomez would therefore lose various privileges for 30 days. Gomez responded, "Fuck this discipline time. I should have fucking slashed Montoya's throat when I had a chance. . . . Just wait until those fucking deputies take me to court and I'll slash one of those fuckers."

## 2. Defense Evidence

The defense first offered the testimony of Michael Pickett, a regional administrator for the Department of Corrections. Pickett testified that a defendant like Gomez "can only be assigned to a Level 4 institution" and would most likely be sent to the most secure classification of facility, known as a "Security Housing Unit" or "SHU." Pickett explained that "it's not a perfect world at a Level 4 prison" despite the high security and that homicides as well as assaults occurred at such facilities. Based on what he knew about Gomez, Pickett predicted that Gomez would be moved to the Corcoran SHU facility or the Pelican Bay State Prison SHU facility, where he would be confined to a cell for roughly 23 hours per day. He would leave his cell only for exercise in a yard adjacent to the SHU or for medical and legal visits, during which he would be shackled and escorted by a guard. Pickett also testified that all visits with a Level 4 SHU inmate are "non-contact," meaning there would be a Plexiglas partition between the inmate and the visitor. On cross-examination, Pickett detailed a race-related riot that occurred at Pelican Bay State Prison the previous morning. Pickett also opined that there is a higher level of violence at the more highly secured prison facilities because the inmates in such facilities are more violent. Pickett further testified that murders and violent assaults have been ordered by prison gang members in the SHUs against prisoners in the general population.

The defense also presented the testimony of Gomez's sister, Mercedes Sanabria. She testified that Gomez has three children under the age of 12 and that she has brought the children to visit Gomez at the county jail. Sanabria further testified that the children love their father and that she loves

her brother. She said to the jury "that despite what my brother has done, we are real sorry, but we all love him, and we just don't want him to be executed."

## II.   PRETRIAL ISSUES

### A. Preemptive Denial of Gomez's Right to Self-Representation

Nine months before jury selection, Gomez invoked his right to represent himself under *Faretta v. California* (1975) 422 U.S. 806. At that time, the court warned him, "[Y]ou can't go back and forth on this. If you want to represent yourself, that's fine. That's going to cause a delay in the proceedings, and you just can't keep switching back and forth between being represented by counsel and representing yourself." After determining that Gomez's waiver of the right to counsel was knowing and intelligent, the court granted Gomez pro se status. But two weeks later, Gomez expressed his desire to "relinquish" his pro se status and asked that the court reappoint counsel. The following colloquy ensued:

> "THE COURT:   Is that what you want to do, Mr. Gomez?
>
> "GOMEZ:   Yes.
>
> "THE COURT:   I told you before you can't switch back and forth.
>
> "GOMEZ:   I know that.
>
> "THE COURT:   I'm going to hold you to this kind of a change. I think it's a good change for you. I think you're doing the right thing. All I'm saying is I'm not going to let you bounce back and forth. You have a right to represent yourself, I recognize that

and gave that to you, and as of this moment you do represent yourself. And it's better for you and it's better for me as well to have an attorney who knows the rules and will effectively represent you to do that for you. So at this point you understand that if I'm going to change back, this is a final change.

"GOMEZ:      I understand that, yeah.

"THE COURT:  And that's what you want to do?

"GOMEZ:      Yes, sir.

"THE COURT:  Okay. Mr. Nardoni is appointed then."

Gomez argues that this colloquy amounted to a preemptive denial of Gomez's constitutional right to self-representation. Quoting *People v. Windham* (1977) 19 Cal.3d 121, 128, he contends that when " 'a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be.' " Because the court gave Gomez the impression that he could not ask to represent himself, he argues, he never had the opportunity to invoke such a right, even if such requests had been timely. But because Gomez never re-invoked his *Faretta* right, he cites to our decisions in *People v. Dent* (2003) 30 Cal.4th 213 (*Dent*) and *People v. Lancaster* (2007) 41 Cal.4th 50, 69–70 (*Lancaster*) as precedent for the proposition that where the court entirely forecloses the possibility of future self-representation, *Faretta* is violated.

In *Dent*, the defendant's appointed counsel failed to show up on time for the first day of trial. (*Dent, supra,* 30 Cal.4th at

p. 216.) After "delineat[ing] the history of defense counsel's requests for continuances and failure to appear on the record," the trial judge indicated that he would continue the trial once again and relieved the defendant's attorneys as counsel of record. (*Ibid.*) He then advised the defendant that he " 'must be represented by attorneys that are senior trial attorneys. And you have got to have people here to represent you. You cannot represent yourself in this matter.' " (*Ibid.*) When the defendant asked to say something in response, the trial judge prevented him from doing so without attorneys present. (*Ibid.*) Later, after the defendant suggested that he would prefer to represent himself rather than receive new counsel, the trial judge flatly stated that he was " 'not going to let him proceed pro. per. . . . Not in a death penalty murder trial.' " (*Id.* at p. 217.) The trial court proceeded to appoint new counsel, and the defendant did not renew his *Faretta* motion. (*Dent*, at p. 217.) On this record, we held that "the trial court's response was not only legally erroneous but also unequivocal, and foreclosed any realistic possibility defendant would perceive self-representation as an available option." (*Id.* at p. 219.)

*Lancaster* distinguished *Dent* on the ground that *Dent* "involved [an] outright denial of the right [to self-representation]." (*Lancaster*, *supra*, 41 Cal.4th at p. 70.) In *Lancaster*, as here, the defendant had vacillated between self-representation and the right to counsel. After the fourth such change of heart, the court similarly admonished the defendant: " 'I do need to advise Mr. Lancaster that you cannot continue to change between representing yourself and having appointed counsel represent you. The reason for it is that we've got to move forward, and that doesn't allow us to do that. [¶] I think it's a very wise move on your part, as I said. . . . But having originally

had an attorney, gone pro per, had an attorney, gone pro per, now you're back to an attorney, I can't let you continue to change from one to the other. It has to be a permanent decision on your part. [¶] Even if at some point you have some disagreement with what Mr. Rothman is doing, you can't just say now I'm back pro per. That's a decision for the court to make, and it probably would not be in your favor.'" (*Id.* at p. 69.)

We rejected the defendant's argument that the court's comments were "a 'preemptive denial' of his *Faretta* right," noting that in light of "the court's protracted grappling with the logistics of providing defendant with discovery materials and access to legal resources, the court's concern with his repeated alternation between self-representation and the services of counsel was warranted." (*Lancaster*, *supra*, 41 Cal.4th at p. 69.) We held that "[t]he court's reference to the need for a 'permanent decision' . . . did not entirely foreclose the possibility of defendant's future self-representation." (*Ibid.*) Rather, "it told him it would make a decision on any renewed application, though the request would probably not be viewed with favor." (*Ibid.*)

The instant case is more similar to *Lancaster* than *Dent*. In *Lancaster*, the court warned the defendant that " 'you cannot continue to change' " because " 'we've got to move forward,' " although the decision to request counsel was " 'wise.' " (*Lancaster*, *supra*, 41 Cal.4th at p. 69.) Here, the court said, "I'm going to hold you to this kind of change," and "it's a good change for you." When Gomez first asked to represent himself, the court had already warned Gomez that he could not "go back and forth on this" because "[t]hat's going to cause a delay in the proceedings." But, unlike in *Dent*, the court expressly told Gomez that "[y]ou have the right to represent yourself if you

make a knowing and intelligent waiver of your right to counsel" and "[i]f you want to represent yourself, that's fine," and the court granted Gomez's initial request to proceed in propia persona.

Gomez seizes on subtle distinctions in wording to argue that while the court in *Lancaster* "did not entirely foreclose the possibility of defendant's future self-representation" (*Lancaster, supra*, 41 Cal.4th at p. 69), here the court told him unequivocally that future requests for self-representation would be denied. But this misunderstands the import of *Lancaster*, which held that the trial court's comments, taken in context, could not be characterized as a preemptive denial of the defendant's *Faretta* right. (*Lancaster*, at p. 69.) *Lancaster* did not hold that had the trial court's comments been phrased in more certain terms, such comments would have amounted to reversible error. Instead, we commented that the trial court's reference to a "permanent" decision may have been "precipitous" due to the fact that trial was not imminent, but "the impropriety was slight" and did not cause fundamental error. (*Id.* at pp. 69–70.) As we explained, these admonitions are generally inadvisable but also reflect "the difficulties posed by [a] defendant's intermittent assumptions of his own defense" and thus constitute an understandable "attempt to discourage defendant from perpetuating those difficulties." (*Id.* at p. 70.)

That a trial court may directly deny a *Faretta* request when it is designed "to frustrate the orderly administration of justice" (*People v. Marshall* (1997) 15 Cal.4th 1, 23) suggests that courts are not foreclosed from preemptively discouraging such requests when it identifies a pattern of vacillation that, over time, will harm the progress of trial and the defendant's ability to put on a defense. When considered in context, the trial

court's statement that "this is a final change" did not "unequivocal[ly] . . . foreclose[] any realistic possibility [Gomez] would perceive self-representation as an available option" (*Dent, supra,* 30 Cal.4th at p. 219). Therefore, the trial court's warning, while inadvisable in its assertion that any chance would be "final," was not erroneous.

## B. Trial Court's Hypothetical During Voir Dire Regarding Credibility of Accomplice Testimony

During jury selection, the prosecution was interested in probing prospective jurors' feelings regarding the propriety of exchanging testimony against another for prosecutorial leniency. Page 12 of the jury questionnaire asked: "How do you feel about the situation in which the prosecution decides not to prosecute one person in exchange for that person's testimony against another person?" The court asked follow-up questions of those who expressed hesitation or distaste for such practices, and pressed jurors to explicate their feelings in greater detail.

When a juror did not understand the question, the court offered the following hypothetical as "an example of the kind of thing which [the court] think[s] makes some sense to people at least. [¶] That is say there's a bank robbery situation. There are two people involved, one stands outside as a lookout. The other bank robber actually goes in to rob the bank, and in the process kills somebody. [¶] We've got good evidence supposedly in this hypothetical as to the person standing outside. We know that person is a lookout and can be convicted for participating in the bank robbery and is actually responsible under the law for the robbery and the killing that occurred in the bank. But the real person that pulled the trigger is the second person, and law enforcement is more concerned about that person than the

one that stood outside.  [¶] Do you see a problem with the idea of granting some lenience to this person that stood outside as a lookout, saying that that person is either going to agree to a lesser penalty or perhaps even be immunized entirely in order to get that person's testimony against the actual bank robber?"

Gomez argues that the trial court's attempts to elucidate the significance of the questionnaire's inquiry into accomplice testimony "improperly informed jurors that the prosecution would only grant leniency to the less culpable party involved in a crime."  Although counsel did not object to this hypothetical during voir dire, Gomez argues that the relevant exchanges between the court and prospective jurors amounted to instructional error.  (*People v. Dunkle* (2005) 36 Cal.4th 861, 929–930 ["[W]e do not deem forfeited any claim of instructional error affecting a defendant's substantial rights."].)  We disagree.  The trial court's hypothetical was clearly meant to expand upon and explain the significance of the questionnaire's inquiry.  To the extent that the hypothetical may have suggested that the trial court had personal confidence in the prosecutor's choice with respect to whom to prosecute, counsel could have objected.  But counsel did not.  Accordingly, Gomez has forfeited this claim.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 653 ["[A] defendant may not challenge on appeal alleged shortcomings in the trial court's voir dire of the prospective jurors when the defendant, having had the opportunity to alert the trial court to the supposed problem, failed to do so."].)

On the merits, the trial court did not err.  By describing the underlying logic for why a prosecutor might exercise leniency with respect to one accomplice in exchange for testimony, the trial court's manifest intention was to add greater granularity to the questionnaire.  Each time the trial

court engaged a prospective juror with the hypothetical, it was expressly framed in relation to page 12 of the voir dire questionnaire. The court described the hypothetical as an "example" that "makes some sense to people," suggesting that the trial court did not personally hold the views that it described. Its evident purpose was to draw out the prospective jurors' views as to the propriety of exchanging testimony for prosecutorial leniency, not to personally vouch for the prosecution's choice of defendant. Moreover, the trial court later instructed the jury about evaluating witness credibility in the instant case, which further clarified that any views suggested by the hypothetical were irrelevant.

## C. Motion for Severance of Counts and Separate Trials

Gomez argues that the trial court abused its discretion in denying his motion to sever his trial from his codefendant's trial and his motion to sever his charges. Gomez claims that these alleged errors, "both alone and in combination," violated his rights to due process, a fair trial, a reliable guilt and penalty determination, and his right to be free from cruel and unusual punishment under both the federal and state Constitutions.

Before trial, Gomez first moved to sever his trial for the murders of Robert Acosta and Robert Dunton from that of codefendant Arthur Grajeda. Gomez then moved to sever his counts, seeking a joint trial on the charges arising from the Acosta and Dunton murders and the Jesus Escareno murder, and separate trials for the Xavier Salcedo robbery, the Rajendra Patel murder, and the Raul Luna murder.

The trial court considered Gomez's motions together and denied them both. After stating that it was "obvious . . . that the

defendants should be tried together on [the Acosta and Dunton counts]," the court found that the counts against Gomez were "tied closely together in time and to some extent in location" as well as "in the manner in which the executions took place"; the same witness would testify in the Escareno case and the Acosta and Dunton case; the robbery charges involved similar items; the Luna and Escareno homicides involved cars; and Luna's stolen cellphone was used to call Dunton's house, where Gomez occasionally stayed. Although the court expressed concern with the number of crimes that Gomez was charged with, it ultimately concluded that the crimes "are so well tied together that . . . they should be tried together."

### 1. *Motion to Sever Trial from Codefendant's Trial*

We have frequently recognized the Legislature's preference for joint trials. (E.g., *People v. Souza* (2012) 54 Cal.4th 90, 109; see § 1098 ["When two or more defendants are jointly charged with any public offense . . . they must be tried jointly, unless the court order[s] separate trials."].) Factors that may bear on a trial court's decision to order separate trials include " 'an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40, quoting *People v. Massie* (1967) 66 Cal.2d 899, 917.) Severance may also be appropriate where " 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 452, quoting *Zafiro v. United States* (1993) 506 U.S.

534, 539.) "If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable the defendant would have obtained a more favorable result at a separate trial." (*People v. Burney* (2009) 47 Cal.4th 203, 237.) But, "[e]ven if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 162, quoting *People v. Arias* (1996) 13 Cal.4th 92, 127.)

Gomez argues that he should have been tried separately from Grajeda because Grajeda sought to blame the Acosta and Dunton murders on Gomez, whom Grajeda characterized as "violent, paranoid and drug crazed." But, as Gomez acknowledges, " '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 162 (*Tafoya*); see also *Zafiro v. United States*, *supra*, 506 U.S. at pp. 538–539.) And we have previously suggested that antagonistic defenses require severance only where " ' "the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty." ' " (*People v. Carasi* (2008) 44 Cal.4th 1263, 1297–1298, quoting *People v. Hardy* (1992) 2 Cal.4th 86, 168.)

Gomez does not contend that such a conflict exists here. Rather, he claims that Grajeda received an inherent "advantage" as "a 'lesser' participant" in the crime. Such an advantage, Gomez argues, necessarily "work[s] to the disadvantage of a 'greater' participant, and indeed the very existence of such advantages and disadvantages undermines

the principle of individual guilt." But this argument merely homes in on one aspect of Grajeda's antagonistic defense, i.e., that Grajeda played a lesser role than Gomez in murdering Acosta and Dunton. And " '[i]f the fact of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1081.)

Gomez also claims that he was prejudiced during the penalty phase because the jury knew that the prosecution had sought the death penalty for him but not for Grajeda. We have previously rejected this argument (*Tafoya*, *supra*, 42 Cal.4th at pp. 163–164), and Gomez offers no reason why we should revisit our precedent here. Accordingly, we reject Gomez's claims that the trial court should have severed his trial from Grajeda's.

### *2. Motion to Sever Counts*

Section 954 allows for the joint trial of "two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses." Where joinder is proper under section 954, "[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*People v. Soper* (2009) 45 Cal.4th 759, 773.) In determining whether a court abused its discretion in declining to sever properly joined charges, we first consider "the cross-admissibility of the evidence in hypothetical separate trials." (*Id.* at p. 774.) If the evidence is cross-admissible, then this "is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Id.* at pp. 774–775.) If not, then we also consider

"(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Id.* at p. 775.) Moreover, "[e]ven if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that 'the joint trial resulted in such gross unfairness as to amount to a due process violation.'" (*People v. Landry* (2016) 2 Cal.5th 52, 77.)

Gomez concedes that all of his counts were properly joined under section 954 and that he should have been tried for the Acosta, Dunton, and Escareno murders in the same proceeding. But he contends that each of the remaining cases should have been tried separately because the evidence underlying those cases was not cross-admissible; the Acosta, Dunton, and Escareno murders were particularly inflammatory; the evidence linking Gomez to the Luna and Patel murders was weaker than the evidence linking him to the other crimes; and the Luna murder did not initially involve a capital crime, whereas the other murders did.

In denying Gomez's motion for discretionary severance, the trial court noted that a shotgun was used in the Acosta, Dunton, Escareno, and Luna murders; Witness No. 1 was a witness to the Acosta, Dunton, and Escareno murders; and Luna's cell phone was used to call Dunton's house, where "Gomez was at least a part time resident." The trial court was also aware that the prosecution planned to tie the Salcedo

robbery to its broader theory that "Gomez was ripping off dope dealers in the Harbor area."

Even if cross-admissibility alone did not justify the trial court's denial of Gomez's severance motion, the balance of the remaining factors does not show that the trial court abused its discretion. (See *People v. Simon* (2016) 1 Cal.5th 98, 123 (*Simon*) ["Although cross-admissibility of evidence is often an independently sufficient condition justifying a trial court's denial of severance, it is not a necessary one."].) First, neither the Acosta and Dunton double homicide nor the Escareno homicide was more inflammatory than the other crimes. Although evidence of gang membership can be particularly inflammatory (see, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 193) and the prosecution's theory of the Acosta and Dunton murders was that they were gang related, we do not agree that the jury would have been more inflamed by that crime than the murder of Patel, who appeared to be unknown to Gomez, or the murder of Luna, who was murdered at the home that he shared with his family. And although the Salcedo robbery did not involve a murder, "the animating concern underlying this factor is not merely whether evidence from one offense is repulsive," but " ' "whether strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' " (*Simon*, at p. 124.) The Salcedo robbery does not raise such a concern because, as Gomez acknowledges, the trial court was aware that the victim's testimony would be offered in that case.

Second, the Luna and Patel cases were not so weak as to risk prejudicial joinder. Although the other cases may have been supported by eyewitness testimony, more substantial forensic evidence, or both, "a mere imbalance in the evidence

between the joined crimes does not signal a risk that one charge will be prejudicially bolstered." (*People v. Johnson* (2015) 61 Cal.4th 734, 752.) And the trial court was aware that substantial evidence linked Gomez to the Luna and Patel murders, including evidence showing that Gomez was near Luna's home around the time of his murder and that Gomez had possession of Patel's jewelry and car.

Third, although the Luna murder was not initially charged as a capital crime, this factor does not carry substantial weight in favor of finding prejudice. Even if the Luna murder had been tried separately, Gomez still would have faced the death penalty based on the other murders. Thus, joining Gomez's charges "neither converted the entire matter into a capital case nor bolstered the possibility of [Gomez] receiving a death sentence." (*Simon*, *supra*, 1 Cal.5th at p. 128.)

We therefore conclude that the trial court did not abuse its discretion in denying Gomez's motion for four separate trials. Moreover, upon reviewing "events *after* the court's ruling," we do not find that "joinder actually resulted in 'gross unfairness' amounting to a denial of [Gomez's] constitutional right to fair trial or due process of law." (*People v. Merriman* (2014) 60 Cal.4th 1, 46.) Despite the trial's relative length and complexity, and even if the prosecution's closing arguments occasionally "encouraged the jury to aggregate the evidence," the record does not suggest that the jury was unable to decide each count separately as it was specifically instructed to do. Indeed, although an "error in denying severance cannot be saved by the fact that the jury was unable to agree on a verdict as to [improperly joined charges]" (*People v. Smallwood* (1986) 42 Cal.3d 415, 433), the fact that the jury acquitted Gomez of the charge that he robbed Luna and could not reach a verdict on the

Escareno charges does tend to show that "the jury was capable of, and did, differentiate among [Gomez's] crimes" (*People v. Jones* (2013) 57 Cal.4th 899, 927; see *Simon, supra,* 1 Cal.5th at p. 130).

Accordingly, we are not convinced it was " 'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.' " (*People v. Merriman, supra,* 60 Cal.4th at p. 49.) Nor are we convinced by Gomez's unsupported claim that his right to a reliable penalty phase determination was violated.

## III.   GUILT PHASE ISSUES

## A. Sufficiency of the Evidence

### *1. The Luna Murder*

Gomez argues that the evidence was insufficient to convict him of the murder of Raul Luna. In his view, the evidence at best showed that two people were present in Raul Luna's front yard when he was murdered but did not show Gomez shot Luna.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Elliott* (2013) 53 Cal.4th 535, 585 (*Elliott*).) Our review must "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might " 'be reasonably reconciled

with the defendant's innocence.' " (*Id.* at p. 92; see *People v. Maury* (2003) 30 Cal.4th 342, 403.) The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Towler* (1982) 31 Cal.3d 105, 117–118.)

Gomez argues that "there was *no evidence at all* that Gomez shot Luna." The evidence showed that a car pulled up to Raul Luna's residence and then drove away. Rudy Luna testified that he then heard two men talking to one another immediately before the murder and that one of the accomplices identified Raul Luna before shooting him in the head. This evidence suggests that Luna was murdered through a joint undertaking of two accomplices. That they were speaking to one another at the time of the murder indicated that they were working together. And that one of the accomplices specifically identified Raul Luna immediately before he was murdered suggests that he was the intended target of the coperpetrators' criminal objectives. So even without indicating who was the shooter, substantial evidence suggested that the two worked together to deliberately murder Raul Luna according to a predetermined plan.

To prove that a defendant is an accomplice the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. " (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) "The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who the direct perpetrator or to what extent each played which role." (*People v. McCoy* (2001)

25 Cal.4th 1111, 1120.) Here, the jury need not have unanimously agreed on which accomplice personally shot Luna and which aided or abetted the murder. (*See People v. Santamaria* (1994) 8 Cal.4th 903, 918 ["[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator."].)

The sole issue in dispute as to Gomez's sufficiency challenge is whether Gomez was one of the two accomplices, and substantial evidence places Gomez at the crime scene at the time of the murder. The evidence connected Gomez to both the Oldsmobile that was likely used as part of the murder's commission and the surrounding area of Luna's residence immediately after the murder. First, investigators found Gomez's fingerprints on an Oldsmobile parked about 150 to 200 yards from the crime scene. The car was conspicuously parked with the windows down, key in the ignition, with a warm engine, and with wet tires — all evidence suggesting the car had been recently driven. Seven unspent 12-gauge shotgun shells, which matched the unspent shotgun shell discovered near Luna's body, were found in the back of the car and connected the vehicle to the murder. And Luna's neighbor, William Owens, testified that he saw Gomez running down the street around the time of Luna's murder.

Further, the evidence tended to show that Gomez used Luna's cell phone immediately after Luna's murder. Over the course of five hours after Luna's death, 10 calls were made from Luna's cell phone; the last call was made to Dunton's house,

where Gomez occasionally stayed, suggesting that Gomez used Luna's phone to call home. And Witness No. 1 testified that Gomez had brought Luna's phone to Dunton's apartment.

In sum, the record contains substantial evidence that Luna's murder was the object of a joint criminal effort perpetrated by two men working in concert. Substantial evidence showed that Gomez was one of these men and therefore could properly be convicted of first degree murder without a specific finding that he personally was the shooter. The jury's verdict — finding Gomez guilty of first degree murder but declining to convict him of the firearm enhancement — is supported by substantial evidence.

### 2. *The Patel Murder*

Gomez argues that "[n]o physical or forensic evidence linked Gomez to the Patel killing" and that "[t]he only evidence connecting [him] to the crimes against Patel . . . was the highly unreliable testimony of Witnesses #1 and #3," which Gomez argues is "incredible as a matter of law." He seizes upon Witness No. 1's checkered past, highlighting his prolonged drug addiction and regular association with drug traffickers, as well as his apparent readiness to lie to authorities during the course of their investigations. He adds that the government gave Witness No. 1 a $30 per diem during the trial, despite his admissions outside of the presence of the jury that he was willing to feign hallucinations in order to collect Social Security benefits for mental disability, a fact that would tend to show that Witness No. 1 would not hesitate to lie in exchange for government benefits.

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary

conflicts." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) Witness No. 1 may not have been an ideal witness for the prosecution, but his testimony indicated that Gomez possessed Patel's car after his murder and that Gomez believed he needed to destroy inculpatory evidence of Patel's murder that could be found within. Moreover, Witness No. 1 testified that Gomez admitted to murdering Patel, stating that he "hated to kill that guy." Nothing about this testimony is "physically impossible or inherently improbable" (*Young*, at p. 1181), nor can Witness No. 1's story be discounted without resort to " ' " 'inferences or deductions' " ' " about his motivations to perjure himself (*People v. Thompson* (2010) 49 Cal.4th 79, 124). His "testimony [could have been] vulnerable to impeachment for numerous reasons" (*People v. Brown* (2014) 59 Cal.4th 86, 105), such as his hallucinations (whether real or fabricated) and his role as an accomplice after the fact of the crime. But these " 'doubts about the credibility of the in-court witness should be left for the jury's resolution.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.)

Gomez also argues that the testimony of Witness No. 1 and Witness No. 3 "contradicted each other in significant respects" such that neither could be believed. He points out that while Witness No. 3's testimony suggested that Gomez exchanged Patel's jewelry for drugs the same night of the murder, Witness No. 1 testified that Gomez brought the jewelry to Dunton's house and left it there overnight. In essence, Gomez argues that because Witness No. 1 and Witness No. 3 gave conflicting accounts of the time that Gomez possessed Patel's jewelry, we must conclude that their testimony was "physically impossible." But "[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact" (*Young*,

*supra*, 34 Cal.4th at p. 1181) in the "absence of patent falsity, inherent improbability, or other reason to question [the testimony's] validity" (*People v. Prunty* (2015) 62 Cal.4th 59, 90).

Despite the various reasons for discounting Witness No. 1's credibility and the minor conflicts between Witness No. 1's and Witness No. 3's testimony, sufficient evidence supported the jury's determination of guilt. Patel's body was discovered near the Terminal Island Freeway on-ramp without his white Camry or jewelry. Investigators found a trail of blood stretching 75 feet from Patel's body, which was consistent with the county medical examiner's testimony that Patel could have walked or run 75 feet after receiving his stab wounds, but not after receiving the gunshot wound to the head, as well as with the spent shell casings found both near Patel's body and around 90 to 100 feet away. Although the precise timeline of when Gomez arrived at Witness No. 3's home is unclear, she did testify that she saw a white car parked in the driveway while Gomez was there. Moreover, Witness No. 1 testified that Gomez eventually asked him to burn the car in an apparent attempt to destroy evidence that would inculpate Gomez. Witness No. 1 was instructed to inspect the trunk "to make sure there wasn't no blood in it," and Dunton testified that Gomez was worried about his fingerprints. As noted, Witness No. 1 testified that before Gomez asked him to burn the car, Gomez expressed that he had "hated to kill that guy." Two days after investigators found Patel's body, they found his car with its interior burnt.

In sum, a rational jury could have credited Witness No. 1's and Witness No. 3's testimony that Gomez admitted to the crimes against Patel, despite their inconsistencies, and could also rationally conclude that Gomez possessed the car immediately after Patel's murder and attempted to destroy

evidence of the crimes. Substantial evidence supports the jury's finding that Gomez is guilty of kidnapping, robbing, and murdering Patel.

### 3. *The Acosta and Dunton Murders*

Gomez argues that although the evidence presented supported the jury's finding that Gomez used a shotgun to kill Acosta and Dunton, there is insufficient evidence to support a jury's finding of premeditation and deliberation. The thrust of the prosecution's case for premeditation was that Grajeda and Gomez's Mexican Mafia ties required them to kill Acosta and Dunton for their failure to pay "taxes" to the gang. But Gomez argues that it was *he* who was marked for violent retaliation, undermining the possibility that he cooperated with Grajeda to execute Acosta and Dunton. Rather than coldly following the dictates of the Mexican Mafia's rules, Gomez argues that he acted rashly out of fear those rules would be turned upon him.

First degree murder "has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) These elements require "more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Ibid*.) " ' "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080, citing *People v. Mayfield* (1997) 14 Cal.4th 668, 767.) We have previously noted that evidence of planning, motive, and manner of killing is often relevant to this inquiry. (*People v. Halvorsen* (2007) 42 Cal.4th

379, 419–420 (*Halvorsen*), citing *People v. Anderson* (1968) 70 Cal.2d 15, 26–27; accord *People v. Sandoval* (2015) 62 Cal.4th 394, 424.)

The evidence supported the conclusion that Gomez was at least aware of a calculated plan to execute Acosta and Dunton. Witness No. 2 observed Gomez and Grajeda having a private conversation the day before the murder. As Witness No. 1 and Gomez approached the apartment, Gomez stated that "they sent somebody to fuck [Dunton] and [Acosta] up." And the moments immediately preceding the murders strongly suggested that Gomez was part of this calculated plan and that he intended to enforce Mexican Mafia rules. Witness No. 1 testified that Gomez was sitting at the dining room table with a pump shotgun in front of him, while Grajeda held the shotgun belonging to Dunton and Witness No. 1. Grajeda said "[y]ou know the rules," to which Gomez added "[y]eah, forward and backward." Dunton responded, "if I got to go, I'm going to go like a man." Witness No. 1 then heard four shots and footsteps as Grajeda and Gomez fled the scene.

There was also evidence of motive. Both Gomez and Grajeda had ties to the Mexican Mafia. Sergeant Valdemar testified that someone who was placed on a "green light list," i.e., marked for assault or murder by the Mexican Mafia, could remove him or herself from the list by carrying out a murder on the Mexican Mafia's behalf. Witness No. 2 testified that on the evening before Acosta and Dunton's murder, Grajeda told him that he wanted to take care of Gomez for failing to pay taxes to the gang. Witness No. 2 and Grajeda then went to Dunton's house, where Witness No. 2 noticed that Gomez was "nervous" and "walking back and forth," and as noted, Gomez and Grajeda had a private conversation. When Witness No. 2 and Grajeda

drove away, Grajeda again stated that he wanted to kill Gomez and possibly Dunton if he didn't pay his taxes.  This evidence is consistent with the prosecution's theory that Gomez killed Acosta and Dunton on behalf of the Mexican Mafia in order to remove himself from the green light list discussed by Valdemar.

Finally, the manner of killing tended to show that Gomez acted with premeditation and deliberation:  Acosta and Dunton were shot from close range in the head or neck.  (See *Halvorsen, supra,* 42 Cal.4th at p. 422 [victims "were shot in the head or neck from within a few feet, a method of killing sufficiently ' "particular and exacting" ' to permit an inference that defendant was 'acting according to a preconceived design' "].)

As for Gomez's claim that his role in the Acosta and Dunton murders was an instant reaction to being targeted for violent retaliation, the tenor of the conversation between Acosta, Dunton, Grajeda, and Gomez was suggestive of a situation over which Grajeda and Gomez had control.  Dunton's words that "if I got to go, I'm going to go like a man" indicated resignation to a death he believed to be imminent due to the circumstances, an inference that would not have been lost on Gomez.  Grajeda's reference to the "rules" requiring the killing of Acosta and Dunton was affirmed and adopted by Gomez, indicating that he had undertaken to apply Mexican Mafia rules in concert with Grajeda.  These facts are inconsistent with the notion that Gomez acted rashly out of fear that he was about to be executed.  There is also little indication that Acosta and Dunton attempted to fire upon Gomez first, even though Acosta was armed at the time of his death.  Since our task is not to "resolve[] . . . credibility issues [or] evidentiary conflicts" (*Young, supra,* 34 Cal.4th at p. 1181), and because we consider the evidence in the "light most favorable to the judgment"

(*Elliott, supra*, 53 Cal.4th at p. 585), we conclude there was sufficient evidence to support the jury's finding of premeditation and deliberation.

## B. Gomez's Refusal to Appear in Court

One morning of trial, Gomez refused to come to court, eventually causing a 38-minute delay in the day's proceedings. The court required presentation of evidence concerning Gomez's refusal to attend the proceedings and instructed the jury that it could consider this evidence as tending to prove consciousness of guilt. Gomez argues that the trial court's instruction and admission of the evidence not only constituted an abuse of discretion, but also violated his federal and state constitutional rights. He further claims that the trial court failed to act as a neutral arbiter, thus violating his constitutional rights to due process.

### *1. Background*

On December 14, 1999, the second day of his trial, Gomez refused to go to court for trial. The guard assigned to his cell block alerted the court, which issued an extraction order. Upon hearing of the order, Gomez got up and voluntarily came to court. As a result of his delay, that day's proceedings started 38 minutes late.

Before the jury was seated, the trial judge apprised the parties of the situation and then said, "At some point this is probably information that is going to go to the jury." He continued, "It's now 40 minutes after the starting time was set, so I'm not sure what the options are, but it does seem to me that at least it will come out eventually in the penalty phase." When the jurors were seated, he informed them that "the reason for

the delay may well be presented to you later during the trial. If you're frustrated by it, you're no less frustrated than I was."

At the next break, defense counsel moved for a mistrial. He argued: "The court informed the jury that the reason for the delay may be brought out in trial at some later time. The inference that the court gave, and I think improperly gave to this jury, was that it was a result of one of these two defendants." Even "if a delay was caused by Ruben Gomez," counsel continued, "I can't think of a reason how that would be admissible in the guilt phase of trial unless perhaps he were to testify." The court disagreed and said that "[i]t does show a consciousness of guilt that Mr. Gomez . . . refused to come to court as the court had ordered, so the jury will find out about it one way or another through evidence." The court then said it would "do even more than that if this happens again," noting "I can call my own witnesses." The court subsequently denied the motion for a mistrial.

The next day, before the jury was seated, the trial court elaborated on its previous comments. "[T]he first point," the court said, "is that a defendant in a capital trial has no right to be absent." The court then explained that its research suggested that "evidence of conduct inconsistent with innocence may show consciousness of guilt." Finally, it noted that "the court on its own motion may call witnesses and interrogate them under Evidence Code Section 775." In sum, the court explained, "my concern is that I think it does show a consciousness of guilt that a defendant refuses to come to court . . . . [¶] Someone who is innocent will stay for trial in order to clear his name."

Defense counsel objected, distinguishing the cases cited by the court as concerning defendants escaping from custody or

skipping bail. The trial court interjected: "No. The point is the refusal to come to court . . . . Someone who is guilty . . . has a reason not to come to court . . . . [¶] A person who is innocent will stay for trial in order to clear his name and win lawful liberty." The court continued: "You may have another solution to this, but I don't plan to let it go. I don't plan to let either defendant play with the court and the jury and say I'm going to come when I'm ready. . . . I was here until 8 o'clock last night doing research on the computer trying to find a case exactly in point, and I didn't find one. So I'm going to be a pioneer." The court added: "We're going to have witnesses testify . . . [¶] what we will have is evidence on the subject, and the jury then can draw its own conclusion as to why a defendant refuses to come to court."

The court then held a hearing regarding the admissibility of the proposed testimony outside the presence of the jury under Evidence Code section 402. The prosecution and the defense examined Deputy Sheriff John Ganarial, who had been assigned to take Gomez to court on the morning of December 14, 1999. Ganarial testified that Gomez said "fuck court" several times when Ganarial asked him to get ready for court around 5:50 a.m. After Ganarial told him several more times to get ready, Gomez responded, "They bring me back whenever they want, I'll go to court whenever I want." Ganarial testified that Gomez was ultimately escorted from the cell to court around 9:00 a.m. that morning. Ganarial further testified that Gomez had otherwise been "cooperative as far as being transported . . . to the court for purposes of trial." After Ganarial's testimony, the court said, "I do think that the initial incident that we were talking about on December 14th showed a consciousness of guilt." Defense counsel then repeated his objection to the evidence and argued

that no precedent holds that the jury may infer consciousness of guilt from an in-custody defendant's refusal to attend trial. At the end of the hearing, the trial court ruled that Ganarial's testimony was admissible to show consciousness of guilt.

On the sixth day of trial, the prosecution called Ganarial to testify before the jury about Gomez's delay. Ganarial explained that on the morning in question, he attempted several times to get Gomez to leave his cell for court to no avail. Ganarial then notified the court bailiff of Gomez's refusal; the bailiff subsequently informed him that there was an extraction order for Gomez. Soon after being informed of this order, Gomez voluntarily came to court. In the course of his testimony, Ganarial also said that Gomez was housed in a disciplinary unit of the jail, that he was waist-chained and handled by a "movement team" when he was transported to court, that he was fed through a slot in his cell door, and that on the morning in question, he responded to Ganarial's wake-up calls with "fuck court" multiple times. After the court excused Ganarial, the defense moved to strike the testimony as irrelevant, which the court denied.

At the conclusion of the trial, the judge gave the following instruction to the jury: "If you find that the defendant Gomez voluntarily absented himself from this trial by refusing to come to court, you may consider that as a circumstance tending to prove a consciousness of guilt. That conduct, however, is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

### 2. *Improper Instruction and Admission of Evidence as to Gomez's Consciousness of Guilt*

#### a. Forfeiture

Reviewing courts will generally not consider a challenge to the admissibility of evidence unless there was a " ' "specific and timely objection  in the trial court on the same grounds sought to be urged on appeal." ' " (*People v. Champion* (1995) 9 Cal.4th 879, 918, quoting *People v. Raley* (1992) 2 Cal.4th 870, 892; see Evid. Code, § 353, subd. (a).) The Attorney General contends that Gomez objected only under Evidence Code section 352, thus forfeiting any other challenges to the admission of evidence regarding Gomez's refusal to come to court.

We disagree.  The record shows that counsel argued repeatedly and at length that the admission of the evidence would constitute state-law error.  First, in moving for a mistrial on the basis of the trial court's initial statements to the jury, defense counsel argued, "If a delay was caused by Ruben Gomez, I can't think of how that would be admissible in the guilt phase of trial."  Then, after the court initially expressed its intention to introduce evidence of Gomez's delay, defense counsel responded, "I'd ask the court to reconsider its legal analysis of the situation," and began to argue that the delay could not support an inference of consciousness of guilt before being cut off by the court.  And after the section 402 hearing, defense counsel had another extended argument over whether Gomez's delay showed a consciousness of guilt.  At that point, defense counsel also raised the issue of character evidence, noting that the evidence was "prejudicial because it's another form . . . of the court or the prosecution putting on character evidence when you can't really do that."  Finally, after Ganarial's testimony

before the jury, counsel moved to "strike his testimony as being irrelevant to the charges for what Gomez is presently on trial."

But even if these objections were not specific enough to be preserved for appeal, Gomez's claims would still be reviewable. "Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile . . . ." (*People v. Welch* (1993) 5 Cal.4th 228, 237.) Here, the record suggests that the trial court would have rejected any objection to the testimony. During the initial argument, the court told defense counsel, "You may have another solution to this, but I don't plan to let it go," and explained that even if it could not "find a case exactly in point," it was "going to be a pioneer." The trial court added: "I'm not going to let this go. I'm not going to let the defendants control the court." Then, after hearing Ganarial's testimony at the section 402 hearing, the court told defense counsel, "I have no doubt but what it shows a consciousness of guilt." It was reasonable for defense counsel to believe, based on the trial court's statements, that any further objections regarding the admission of the evidence would be futile. For this reason too, Gomez's evidentiary claims are not forfeited.

Neither is Gomez's challenge to the jury instruction forfeited. We have held that objections at trial are not necessary to preserve appellate review of allegedly erroneous consciousness of guilt instructions. (See *People v. Hannon* (1977) 19 Cal.3d 588, 600; § 1259.) In any case, defense counsel argued at length that no authority supported the trial court's conclusion that Gomez's refusal to come to court possibly indicated consciousness of guilt.

Finally, Gomez has not forfeited his constitutional claims. In *People v. Partida* (2005) 37 Cal.4th 428, we explained that, although a defendant is barred from bringing due process claims on grounds distinct from those raised at trial, "defendant may argue an additional legal consequence of the asserted error . . . is a violation of due process." (*Id.* at p. 438.) The defendant in *Partida* had unsuccessfully objected at trial to the admission of evidence under section 352. On appeal, he argued that the trial court's rejection of this argument violated his due process rights; this Court held that his claim was not forfeited. (*Partida*, at pp. 438–439.) Here, Gomez argued at trial that the consciousness of guilt instruction was unsupportable by evidence of his delay and that this evidence was irrelevant, more prejudicial than probative, and impermissible character evidence. On appeal, he argues that the trial judge's rejection of these arguments violated his due process rights — that is, he argues that "an additional legal consequence of the asserted error" was a violation of his due process rights. (*Id.* at p. 438.) As in *Partida*, "[t]his he may do." (*Id.* at p. 439.)

### b. Merits

" 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 920–921.) "No evidence is admissible except relevant evidence" (Evid. Code, § 350), and "relevant evidence" is defined as "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (*id.*, § 210). "The most common evidentiary device" is the "permissive inference," "which

allows — but does not require — the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant." (*County Court of Ulster County, N.Y. v. Allen* (1979) 442 U.S. 140, 157 (*Ulster County*).)

We have not before considered whether a defendant's brief refusal to attend trial proceedings may give rise to an inference of consciousness of guilt. But, as the Attorney General points out, we have previously held in different circumstances that a defendant's absence from trial can support such an inference. In *People v. Carrera* (1989) 49 Cal.3d 291, we held that evidence concerning a defendant's escape from prison after being arrested and charged was admissible as indicating a consciousness of guilt. (*Id.* at pp. 313–314; see *People v. Schafter* (1911) 161 Cal. 573 [evidence of a plan to escape prison while awaiting trial was admissible as showing a consciousness of guilt].) And in *People v. Snyder* (1976) 56 Cal.App.3d 195, the Court of Appeal concluded that after the defendant skipped bail and missed the guilt phase of his trial, the trial court properly instructed the jury that it could consider the defendant's absence in determining his guilt. (*Id.* at p. 199; see *People v. Sherren* (1979) 89 Cal.App.3d 752 [finding no error in the trial court taking judicial notice that the out-of-custody defendant missed two pretrial hearings and instructing the jury that flight can show a consciousness of guilt].) These holdings are reflected in the pattern jury instruction that says flight, attempted flight, escape, or attempted escape after the commission of a crime "may be considered . . . in deciding whether a defendant is guilty or not guilty." (CALJIC No. 2.52.)

Gomez argues that his temporary refusal to attend trial is analogous to other situations in which we have indicated that a

jury should *not* be permitted to consider a defendant's absence. In *People v. Sully* (1991) 53 Cal.3d 1195, the defendant yelled at jurors after they found him guilty of murder and he informed the court that he would continue to disrupt the proceedings if he were present. (*Id.* at p. 1238.) The court subsequently allowed the defendant to be absent from the penalty phase, which resulted in a capital sentence. (*Id.* at p. 1240.) On appeal, we held that although the trial court informed the jury that the defendant was voluntarily absent, "[a]n instruction to disregard defendant's absence would have been proper on defendant's timely request." (*Id.* at p. 1241.)

We reaffirmed *Sully* and extended its holding to the guilt phase of trial in *People v. Medina* (1995) 11 Cal.4th 694. There, the defendant was disruptive during his murder trial's guilt phase and was allowed to leave; he chose to remain absent for the duration of the guilt and penalty phases of the trial. (*Id.* at p. 737.) On appeal, he argued that the court on its own initiative should have instructed the jury to disregard his absence. (*Id.* at p. 739.) Citing *Sully*, we held that the trial court had no duty to instruct the jury to disregard the defendant's absence but suggested that such an instruction would have been proper if requested. (*Id.* at p. 740.)

We conclude that this case has more in common with the *Sully* line of cases than the cases cited by the Attorney General involving prison escapes and skipping bail. Unlike the absences in *Carrera* or *Snyder*, Gomez's brief refusal to attend court was not an attempt to elude prosecution or punishment. Ganarial's testimony suggests that Gomez intended merely to disrupt the proceedings temporarily. Ganarial recounts Gomez saying, "They bring me back whenever they want, I'll go to court whenever I want." This disruptive intent is further supported

by the obscenities that Gomez repeatedly directed at the court during the delay.

The Attorney General presents two additional theories for why evidence of Gomez's delay could support a permissive inference of consciousness of guilt. First, he cites several cases that have held that in-custody defendants' efforts to prevent the production of evidence could support an inference of consciousness of guilt. (See, e.g., *People v. Watkins* (2012) 55 Cal.4th 999, 1027 [defendant's refusal to participate in a lineup could indicate consciousness of guilt]; *People v. Farnam* (2002) 28 Cal.4th 107, 164 [defendant's refusal to provide a hair or blood sample]; *People v. Ellis* (1966) 65 Cal.2d 529, 536–539 [defendant's refusal to provide a voice sample].) These cases are supported by a series of pattern jury instructions regarding efforts to fabricate or suppress evidence. (See CALJIC No. 2.03 [making false or misleading statements about the charged crime can support an inference of consciousness of guilt]; CALJIC No. 2.04 [trying to fabricate evidence or induce false testimony can support an inference of consciousness of guilt]; CALJIC No. 2.05 [authorizing someone else to fabricate evidence can support an inference of consciousness of guilt]; CALJIC No. 2.06 [attempting to suppress adverse evidence can support an inference of consciousness of guilt].)

These cases and jury instructions concern situations in which a defendant seeks to interfere with evidence, presumably out of fear that it would incriminate them. Here, by contrast, Gomez attempted neither to thwart the production of evidence nor to fabricate false evidence.

The Attorney General also urges that we apply a line of cases upholding permissive inferences where the prosecution

presented evidence of defendants acting in ways that innocent people would not. For example, we upheld a permissive inference of consciousness of guilt based on the fact that the defendant had tattooed the number "187," the Penal Code section defining murder, on his forehead after the alleged murder was committed because "it would be unlikely that an innocent person would so advertise his connection to murder." (*People v. Ochoa* (2001) 26 Cal.4th 398, 438, abrogated on another point as recognized in *People v. Harris* (2008) 43 Cal.4th 1269, 1306; see also *People v. Hartsch* (2010) 49 Cal.4th 472, 505.) But this case presents a different scenario; there is no reason to think Gomez's refusal to come to court was indicative of his consciousness of guilt. He may simply have been tired; as Ganarial testified, inmates on trial are woken before 6:00 a.m. Or he may have been frustrated by the trial process and wanted to assert more control over it. Cases like *Ochoa* do not support the Attorney General's argument that evidence of Gomez's delay was properly admissible to support an inference of consciousness of guilt.

In sum, the evidence concerning Gomez's brief refusal did not have a "tendency in reason to prove" consciousness of guilt; it therefore should have been excluded as irrelevant. (Evid. Code, § 210.)

For the same reasons, the admission of this evidence and the jury instruction violated Gomez's rights to due process. "The due process clauses of the federal Constitution . . . require a relationship between the permissively inferred fact and the proven fact on which it depends." (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 180.) Permissive inferences are therefore constitutionally suspect when, "under the facts of the case, there is no rational way the trier could make the connection permitted

by the inference." (*Ulster County*, *supra*, 442 U.S. at p. 157.) In other words, " '[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.' " (*People v. Yeoman* (2003) 31 Cal.4th 93, 131, quoting *Francis v. Franklin* (1985) 471 U.S. 307, 314–315.) Here, the trial court's proposed inference—that Gomez's brief refusal to attend trial proceedings reflected consciousness of guilt—was " 'not one that reason and common sense justify in light of the proven facts before the jury.' " (*Ibid*.) Thus, the trial court's decision to admit evidence regarding Gomez's refusal to attend court and its jury instruction on consciousness of guilt violated Gomez's constitutional rights to due process.

### c. Prejudice

Although the trial court erred in allowing the jury to consider the circumstances of Gomez's brief absence, we conclude that the errors were harmless under the applicable state and federal standards. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Brown* (1988) 46 Cal.3d 432, 447–448 (*Brown*); *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) Gomez contends that the trial court's errors, "by [their] nature, provided an all-purpose rejoinder . . . to jurors' doubts about Gomez's guilt" and "invited jurors [at the penalty phase] to assuage any lingering doubts about Gomez's guilt with the thought that if Gomez himself knew he was guilty, he must be." Gomez also argues that Deputy Sheriff Ganarial's testimony regarding the manner by which Gomez was held in custody and brought to court was inherently prejudicial.

But the fact that the jury did not find Gomez guilty on all counts suggests that the trial court's errors did not have the

sweeping effect that Gomez contends. Moreover, the prosecution did not rely significantly on Gomez's absence or the circumstances surrounding that absence and made no mention of the episode during its closing argument.

Further, in light of the considerable evidence presented over the months-long trial, we conclude that the trial court's errors did not carry material weight at the guilt phase. Salcedo himself testified that Gomez robbed him at his home. Forensic evidence gathered from a nearby car placed Gomez in the area of Raul Luna's house around the time of his murder, as did the testimony of Luna's neighbor, William Owens. Luna's cellphone was used to call Robert Dunton's house, where Gomez had been staying, and Witness No. 1 testified that Gomez brought the phone to Dunton's house, where it was later recovered by the police. Moreover, both Witness No. 1 and Witness No. 3 testified as to Gomez's role in the crimes against Rajendra Patel, and their accounts were consistent with the forensic evidence gathered on the freeway on-ramp and from Patel's car. Witness No. 1 also testified that Gomez was present at the murders of Acosta and Dunton, and the testimony of Witness No. 1, Witness No. 2, and Sergeant Valdemar tended to show that Gomez killed Acosta and Dunton on behalf of the Mexican Mafia. Detective Winter also testified that in the course of investigating the murder of Jesus Escareno, Gomez mentioned "a couple of guys that were shot and brains were splattered all over the place," which matched the description of the Acosta and Dunton murders. And Gomez's fingerprints were found on a shotgun that matched the spent cartridges found at the Acosta and Dunton murder scene.

We are also not convinced that the trial court's errors influenced the jury's decision at the penalty phase. Gomez was

accused of committing five murders in less than two months, and the jury convicted him of committing four of those murders. The prosecution also offered substantial evidence concerning additional violent acts committed by Gomez, both before the crimes at issue here and while in jail awaiting trial for those crimes, none of which Gomez disputed. In contrast, the defense presented relatively little mitigation evidence, consisting solely of expert testimony regarding high security state prisons and the testimony of his sister.

In light of the foregoing, we conclude that the trial court's errors did not affect the jury's verdicts in this case. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Brown*, *supra*, 46 Cal.3d at pp. 447–448; *Chapman*, *supra*, 386 U.S. at p. 24.)

### 3. *Claim of Trial Court Bias*

Gomez claims that the trial court not only erred in admitting the evidence regarding his brief refusal to attend trial and permitting the jury to infer consciousness of guilt from it, but also demonstrated improper judicial bias in violation of his constitutional rights.

As with Gomez's other claims, the Attorney General argues that Gomez's failure to raise the trial court's bias below precludes us from considering it on appeal. But we have held that a defendant's failure to object to judicial bias "does not preclude review . . . when objecting would be futile." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) In particular, we reasoned in *Sturm* that "the evident hostility between the trial judge and defense counsel" left defense counsel in the fundamentally unfair position of either objecting to the judicial misconduct and risking retaliation against his client or sacrificing the claim on review. (*Ibid.*)

The record reveals a similarly unfair choice for defense counsel here. As described above, the trial judge was clear in his intent to present the evidence concerning Gomez's refusal to attend court. In response to defense counsel's argument that the brief absence was irrelevant to Gomez's consciousness of guilt, the trial judge referred to a time he had jailed a lawyer after trial on contempt charges and then said, "All I'm saying is that you challenged me, and I'm responding to the challenge." He continued, "You did move for a mistrial making it a major issue . . . . This is what I'm doing." Given the trial court's expressed intentions, it is reasonable to believe that any objection concerning judicial bias would have futile. Thus, Gomez has not forfeited his claim that the trial court failed to serve as a neutral arbiter.

Nevertheless, we reject the claim on its merits. We have explained that trial judges violate due process when they " 'officiously and unnecessarily usurp[] the duties of the prosecutor' " and appear to be " 'allying . . . with the prosecution.' " (*People v. Clark* (1992) 3 Cal.4th 41, 143 (*Clark*), quoting *People v. Campbell* (1958) 162 Cal.App.2d 776, 787.) But in reviewing such claims, our role " 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' " (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

Although we are troubled by the trial judge's insistence on being "a pioneer" and his encouragement of Ganarial's testimony, his actions do not amount to a constitutional violation. To be sure, the trial judge might have " 'officiously

68

and unnecessarily usurp[ed] the duties of the prosecutor' " if he had introduced evidence as to Gomez's delay on behalf of the court, as originally discussed. (*Clark, supra*, 3 Cal.4th at p. 143.) But the judge did not do so here. Indeed, he recognized the problems that would arise if the court called Ganarial, so the prosecution agreed to call Ganarial to testify before the jury as a prosecution witness.

We also disagree with Gomez's claim that the trial court improperly arranged for the presentation of Ganarial's testimony "in an effort to punish Gomez for his disrespect to the court." We cannot say, based on this record, that the trial court admitted the evidence and instructed the jury on consciousness of guilt out of a desire to harm or disadvantage Gomez. Rather, the trial court appears to have acted pursuant to its duty to control the trial proceedings (§ 1044) and under the erroneous but honest belief that a defendant's refusal to attend trial was relevant evidence as to a defendant's consciousness of guilt.

In sum, we reject Gomez's claim that the trial court failed to serve as a neutral arbiter. In so doing, we emphasize that although Evidence Code section 775 permits trial courts to call witnesses and interrogate them on its own motion, judges should resort to this power only where they " ' "believe[] that [they] may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause." ' " (*People v. Hawkins* (1995) 10 Cal.4th 920, 948.) Although " '[s]ection 1044 . . . vests the trial court with broad discretion to control the conduct of a criminal trial' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 386, quoting *People v. Calderon* (1994) 9 Cal.4th 69, 74–75), such discretion must be

exercised impartially in order to protect defendants' constitutional rights to due process and to a fair trial. Trial courts may employ different methods in order to ensure that a disruptive defendant does not derail a trial; for example, as it did here, the court may impose a standing extraction order to compel a defendant to attend proceedings. What a trial court cannot do is permit the jury to infer guilt in a manner not countenanced by law.

## C. Admission of Expert Testimony on the Mexican Mafia

Gomez challenges the expert testimony of Sergeant Richard Valdemar regarding the Mexican Mafia as more prejudicial than probative, and as violative of his constitutional rights to due process and a fair trial. Although Gomez concedes that "some gang evidence may have probative value where a crime is alleged to be gang-related and the gang evidence is offered to prove motive," he claims that Valdemar's "testimony about the Mexican Mafia and about shocking crimes committed on its behalf . . . ranged far beyond any proper purpose, serving only to instill fear [among the jurors]." As evidence of the testimony's inflammatory nature, Gomez points to notes passed by members of the jury to the trial court asking whether the jurors were "at risk" of gang violence and expressing "concern[] about possible harassment or problems after [the jurors] are dismissed once the verdicts are read."

We have previously noted that "[e]vidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of

applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) But, "even where gang membership is relevant, because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it." (*People v. Williams*, *supra*, 16 Cal.4th at p. 193.) On appeal, Gomez does not argue that the trial court should have excluded Valdemar's testimony in its entirety. Rather, Gomez contends that portions of the testimony were not relevant to establish Valdemar's expertise or to prove the prosecution's theory that Gomez killed Acosta and Dunton on the Mexican Mafia's behalf.

Assuming Gomez did not forfeit his claims by failing to make more timely or specific objections below (see *People v. Valdez* (2012) 55 Cal.4th 82, 129, fn. 30 [" 'Because the question whether defendants have preserved their right to raise this issue on appeal is close and difficult, we assume [they] have preserved their right, and proceed to the merits.' "]), we conclude that portions of Valdemar's testimony should have been excluded as irrelevant, but that the admission of this testimony did not affect the verdicts.

First, we agree with Gomez that parts of Valdemar's testimony offered to prove Valdemar's "expertise" on gangs were more prejudicial than probative, and should have been excluded. Gomez points specifically to Valdemar's testimony that "just about every crime that you can imagine that's committed on the outside in some way was committed [by gang members] on the inside of the [county] jail facility," including "assaults, battery, murder, the making of contraband weapons, the transportation, sales and use of narcotics, robbery, extortion and rape." Gomez further challenges Valdemar's statement that "a small minority,

normally members of hard core gangs were creating much of the problems that we were experiencing, so by isolating these people and placing them in special units, we eliminated a lot of the assaults that were going on."

This evidence went well beyond its stated purpose of demonstrating that Valdemar had "contact with gang members in the [county] jail," which had already been established by Valdemar's earlier testimony describing the nature of his work and his "interaction with gang members in the county jail while [he was] a deputy assigned to the county jail." Moreover, to the extent that the Attorney General contends this evidence was necessary to help the jury "understand the complex rules of the Mexican Mafia" and to "explain why [Gomez] would comply with Mexican Mafia orders," we disagree that these portions of Valdemar's testimony were more than "tangentially relevant" (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved of on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22) to that purpose. This portion of Valdemar's testimony discussed general gang activity in county jails rather than the specific activity of the Mexican Mafia outside of those jails.

We further agree with Gomez that Valdemar's testimony regarding "the history of the Mexican Mafia, in particular where and when it started and how it started," as well as Valdemar's statement that a certain movie "fairly accurately depicts the early years of the Mexican Mafia," were not " 'necessary to furnish the jury a context for understanding [the prosecution's] theory' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1063, quoting *People v. Roberts* (1992) 2 Cal.4th 271, 299) regarding the Acosta and Dunton murders. That the prosecution believed that Gomez murdered Acosta and Dunton on behalf of the Mexican Mafia did not open the door to any and all evidence

regarding the gang. (Cf. *Masters* at p. 1064 [finding no abuse of discretion where the trial court admitted gang-related evidence pertinent to a particular crime but "made a painstaking effort to exclude [irrelevant or unduly prejudicial] evidence"].) In the absence of any apparent connection between the testimony regarding the early history of the Mexican Mafia and the Acosta and Dunton murders several decades later, and in light of the generally inflammatory nature of this gang-related evidence, the challenged testimony should have been excluded.

But we decline to find that the trial court erred by admitting the other portions of Valdemar's testimony that Gomez challenges on appeal. The testimony indicating that murder was the primary topic of conversation at Mexican Mafia meetings surveilled by Valdemar, and the testimony suggesting that there have been "several instances . . . in the history of the Mexican Mafia" of "a brother kill[ing] another," was relevant to explain why Gomez would kill Acosta and Dunton, with whom he occasionally lived. Moreover, in light of our conclusion in *People v. Gonzales* (2006) 38 Cal.4th 932, 944–947 (*Gonzales*), that the trial court did not err by admitting expert testimony opining generally on the possibility that gang members may intimidate witnesses and commit perjury, we similarly find no error in the trial court's admission of testimony suggesting that "people will come into court and lie for [a Mexican Mafia] associate or . . . member" and "that the [Mexican Mafia] expects that loyal gang members would use any means possible to delay, obstruct or reverse any kind of a criminal prosecution against its members." Much like the expert who testified in *Gonzales*, the expert here did not opine about any individual witness's credibility, but rather focused his testimony on the Mexican Mafia's general reputation.

In any event, we also disagree with Gomez that the admission of any of the challenged testimony affected the outcome of the case. Gomez argues that the jury relied on the testimony as impermissible character evidence and that the testimony caused the jurors to decide the entire case, including Gomez's punishment, based on fear. But, as Gomez concedes, the court properly admitted evidence suggesting that Gomez killed Acosta and Dunton on behalf of the Mexican Mafia, so the jury would have learned about the gang and at least one of its violent practices even if the challenged testimony had been excluded. As for Gomez's contention that the testimony created an "atmosphere of fear" among the jurors such that they acted out of "concern for their own safety," Gomez fails to explain how the jurors' deliberations or verdicts at the guilt phase or the penalty phase were influenced by fear or purported safety concerns, and we cannot readily discern how the outcome was affected ourselves. In light as well of the substantial evidence presented during both the guilt and the penalty phase (see *ante*, at pp. 67–68), we conclude that the trial court's error does not warrant reversal. (*Watson*, *supra*, 46 Cal.3d at p. 836; *Chapman*, *supra*, 386 U.S. at p. 24.)

## D. Admission of Acosta Note

Gomez claims that the trial court's admission of the note left by Acosta to his wife violated Gomez's rights under the confrontation clause of the Sixth Amendment to the federal Constitution. (*Crawford v. Washington* (2004) 541 U.S. 36, 38 (*Crawford*).) In his closing argument, the prosecutor described this note as "the testimony of Robert Acosta from his grave" and argued that Acosta wrote it to inform the reader that he was

going to Dunton's apartment for a meeting with Grajeda, "a known Mexican Mafia associate."

The Attorney General argues that Gomez forfeited his confrontation clause claim because he objected only on hearsay grounds, relying primarily on *People v. Riccardi* (2012) 54 Cal.4th 758, 827, fn. 33. But we overruled *Riccardi* on this point in *People v. Rangel* (2016) 62 Cal.4th 1192 (*Rangel*), where we held that a defendant in a case tried before *Crawford*, like Gomez, "does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial." (*Rangel*, at p. 1215; see *People v. Clark* (2016) 63 Cal.4th 522, 563.)

In *Crawford*, the high court held that the Sixth Amendment prohibits the admission of a witness's "testimonial" out-of-court statements offered for their truth unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. (*Crawford*, *supra*, 541 U.S. at pp. 59–60.) There is no dispute that Acosta was unavailable at trial and that Gomez had no prior opportunity to cross-examine him. Accordingly, Gomez's confrontation clause claim turns solely on the question whether the Acosta note was testimonial.

As we recently observed, "[t]hroughout its evolution of the *Crawford* doctrine, the high court has offered various formulations of what makes a statement testimonial but has yet to provide a definition of that term of art upon which a majority of justices agree." (*People v. Sanchez* (2016) 63 Cal.4th 665, 687.) Nevertheless, "we have discerned two requirements. First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' [Citation.] Second, the primary purpose of the statement must 'pertain[] . . . in some

fashion to a criminal prosecution.' [Citations.]" (*People v. Leon* (2015) 61 Cal.4th 569, 603, quoting *People v. Lopez* (2012) 55 Cal.4th 569, 581–582.) More specifically, the primary purpose test asks whether the statements at issue "are given in the course of an interrogation or other conversation whose ' "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." ' " (*Rangel, supra,* 62 Cal.4th at p. 1214.) In its most recent application of the primary purpose test, the high court cautioned that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." (*Ohio v. Clark* (2015) __ U.S. __ [135 S.Ct. 2173, 2182]; see also *Sanchez, supra,* 63 Cal.4th at p. 694, fn. 19.)

We conclude that the Acosta note was not testimonial because the record does not establish that Acosta left the note for his wife for purposes of criminal investigation or prosecution. According to Gomez, the fact that Acosta left the note in a Bible, memorialized the date and time, and signed the note with his full name supports a finding that the statements in the note were testimonial "because they were made with the intent that they would be communicated to law enforcement and used in court." But there are equally plausible alternative explanations that do not suggest a testimonial intent. Acosta may have simply wanted his wife to know what had happened if he did not return from the meeting, or he may have wanted her to pass the note along to associates who could retaliate against Gomez and Grajeda. That the note referred to Grajeda and Dunton by their "street names" rather than their full names is an additional reason to believe that the note was not specifically intended for

law enforcement. This is not a scenario where the evidence clearly indicates that the recipient was merely a conduit for conveying the declarant's statements to the police. (Cf. *State v. Jensen* (2007) 299 Wis.2d 267, 286 [a letter addressed to police and given to a friend with directions to send to police if " 'anything happen[ed]' " to her was testimonial].) In view of the high court's guidance that statements "made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial" (*Ohio v. Clark*, *supra*, 135 S.Ct. at p. 2182), we conclude that the Acosta note was not testimonial and therefore reject Gomez's confrontation clause claim.

Even if the Acosta note were testimonial, any error was harmless beyond a reasonable doubt. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680; *Chapman*, *supra*, 386 U.S. at p. 24.) The note does not mention Gomez, and there is no dispute that Gomez participated in the killing of Acosta and Dunton. Nevertheless, Gomez contends that the Acosta note was the only evidence corroborating Witness No. 1's testimony that Grajeda was present at Dunton's apartment; without this evidence, Gomez continues, the prosecution's theory that Gomez committed a *premeditated and deliberate* killing at the behest of Grajeda would have been severely undermined. But, as explained above (see *ante*, at pp. 53–54), there is significant evidence showing that Gomez murdered Acosta and Dunton as part of a calculated plan on behalf of the Mexican Mafia, none of which relies on the Acosta note. By contrast, little if any evidence indicates that Acosta and Dunton attempted to attack Gomez first and that Gomez shot them out of fear. Gomez suffered no prejudice even assuming that the admission of the Acosta note was error under *Crawford.*

## E. *Griffin* Error

In his closing argument, the prosecutor discussed evidence that corroborated Witness No. 1's testimony implicating Gomez in the Escareno murder. In particular, the prosecutor pointed to Detective Winter's trial testimony that Gomez "knew facts of the case which had not been revealed to the press" — namely, that the victims' "wallets were missing." He noted that the defense had presented only a couple of news articles and that "those articles don't give Ruben Gomez enough information to have told this to Detective Winter." The prosecutor then said "there's something even more important": "There is absolutely no evidence that Ruben Gomez saw those articles. There is absolutely no evidence that Ruben Gomez read those articles. There is absolutely no evidence that Ruben Gomez reads any newspaper."

Gomez contends that the prosecutor's comments violated *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*). *Griffin* held that "the prosecution may not comment upon a defendant's failure to testify on his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339 (*Bradford*); see *People v. Brady* (2010) 50 Cal.4th 547, 565–566.) At the same time, "we have held that a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*Bradford*, at p. 1339.)

The prosecutor's comments do not amount to *Griffin* error. The prosecutor did not refer to Gomez's decision not to testify. Rather, the prosecutor commented that the defense had failed "to introduce material evidence" — that is, evidence that Gomez had read about the Escareno murder in the newspaper. (*Bradford, supra,* 15 Cal.4th at p. 1339.) Although Gomez argues that only his own testimony could have contradicted the prosecutor's claim that Gomez did not read the articles or newspapers in general, Gomez could have presented other evidence to that effect. As the trial court explained, "[t]here could, for example, have been evidence that [Gomez] subscribed to the San Pedro Pilot, that he was an avid reader and others around him, anyone associated with him knew that he read the paper and commented to others about reading." Accordingly, the prosecutor did not violate *Griffin* by referring to Gomez's failure to introduce such evidence.

### F. Admonitions Regarding Notetaking and Read-back of Testimony

Gomez argues that by sternly advising the jury against "not taking enough notes," the trial court "elevated the importance of juror notetaking over observation of the witnesses" and therefore interfered with the jury's "unique and exclusive responsibility and power to evaluate the credibility of witnesses." Gomez highlights a number of admonitions by the trial judge, including that he would be "very discouraged" to "see jurors just sitting there with their notes in their laps . . . and it won't be recorded in your memories because you aren't trying to take those notes"; that the "thing that infuriates [the trial court] the most about jurors is when they first go in to deliberations and the first hour or two [the court] get[s] a note sent out saying [the jury] want[s] a reread of the testimony . . ."; that jurors

should "take a lot of notes"; and that taking notes was part of their "job in recording the information." He also suggests that the trial court tried to discourage the read-back of testimony by not only failing to state expressly that the jury had a right to rehear testimony, but also noting that any such requests could not be accommodated immediately. Gomez says the trial court's actions violated section 1138 as well as the right to due process, the right to a fair trial, the right to present a defense, the right to counsel, the right to a jury trial, the right to confront witnesses against him, and the right to a reliable and unanimous verdict in a capital case.

We begin by noting that because Gomez did not object to the trial court's admonitions or request a clarifying instruction at trial, his claims are forfeited on appeal. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1168–1169.) In any case, the trial court's various statements about the importance of taking notes and about the read-back of testimony did not amount to error.

Although section 1137 approves of the practice of juror notetaking, we have cautioned that notetaking implicates certain risks, namely, that " 'more significance will be placed by the jurors on their notes . . . than on their own independent recollection. The notes may accentuate irrelevancies and ignore more substantial issues and evidence. . . . [T]he juror with the best notes will unduly influence and possibly mislead the other jurors.' [Citation.] Furthermore, note-taking may 'distract the jurors' attention from the proceedings. . . . While taking notes, the jurors may also not pay sufficient attention to the behavior of witnesses and may thus be unable to properly assess their credibility.' " (*People v. Whitt* (1984) 36 Cal.3d 724, 746, quoting *People v. DiLuca* (1982) 85 App.Div.2d 439, 444–445 [448 N.Y.S.2d 730, 734].) In *Whitt*, we acknowledged that other

jurisdictions "found error in [a court's] failure to give [a] cautionary instruction" regarding the risks of note taking, but we merely opined that giving such an instruction is "the better practice." (*Whitt*, at p. 747.)

We have since held that the trial court is not required to give such an instruction. (*People v. Marquez* (1992) 1 Cal.4th 553, 578.) Here the trial court's warnings, in context, could not have been understood as an instruction that jurors should prioritize notetaking at the expense of their duty to make credibility determinations. To the contrary, the trial court emphasized that the purpose of notetaking was to "refresh your own recollections of what goes on during the trial" and to help the jury "keep all of this organized in your minds." It also "caution[ed]" that jurors should "not . . . take so many notes that [they]'re not watching and listening as the evidence is being presented," that they "should watch the witness while they're testifying as well," and that they should not "have [their] head[s] buried in [their] notes all the time."

The court's emphasis on notetaking did not direct the jury to elevate notetaking over observing the witnesses and evidence, but rather served to caution the jury that notetaking can supplement credibility determinations and ensure that jury deliberations would not be impeded by needless requests for the read-back of testimony. Nor do we read the court's statements as discouraging the read-back of testimony; there was no risk that the jurors were unaware that they could request the read-back of testimony if they decided that they needed it. The trial court did not err.

## G. Alleged Instructional Errors

### 1. Instructions on Deciding Degree of Murder

The trial court instructed the jury that if it found Gomez guilty of murder, it had to determine whether the murder was of the first or second degree. The trial court then instructed the jury with the 1996 version of CALJIC No. 8.71 as follows: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree."

Gomez claims that the trial court unconstitutionally skewed the jurors' deliberations toward first degree murder by giving this instruction because it presents first degree murder as "the default verdict . . . unless the jurors *unanimously* agree[] that they ha[ve] a reasonable doubt about the degree of murder." He argues that this error was compounded by the trial court's failure to give CALJIC No. 17.11, which instructs the jury that if you "have a reasonable doubt as to whether [the crime] is of the first or second degree, you must find [the defendant] guilty of that crime in the second degree."

In *People v. Moore* (2011) 51 Cal.4th 386, we said "the better practice is not to use the 1996 revised version[] of CALJIC [No.] 8.71 . . . , as the instruction[] carr[ies] at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder." (*Id.* at p. 411.) But "[w]e did not hold in *Moore* that the 1996 revised version[] of CALJIC [No.] 8.71 . . . [was] erroneous."

(*People v. Salazar* (2016) 63 Cal.4th 214, 246 (*Salazar*).) Rather, we declined to address the merits of defendant's claim because we concluded any error was harmless beyond a reasonable doubt. (*Moore*, at p. 412.)

More recently, we rejected a defendant's challenge to the use of the 1996 version of CALJIC No. 8.71, concluding that "[n]o logical reading of the instructions leads to a compelled verdict of first degree murder." (*Salazar*, *supra*, 63 Cal.4th at p. 247.) We noted that the jury was also given CALJIC No. 17.40, which states that each juror has a duty to decide the case for herself, and CALJIC No. 8.74, which provides: " 'Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he was guilty of murder of the first degree, murder of the second degree, or voluntary manslaughter.' " (*Salazar*, at p. 247.) Thus, even if the language in CALJIC No. 8.71 was confusing standing alone, we held that "the instructions were not erroneous in this case when considered with the rest of the charge to the jury." (*Id.* at p. 248.)

For similar reasons, we conclude that no such instructional error occurred here. As in *Salazar*, the trial court's other instructions dispelled any potential confusion that may be present in CALJIC No. 8.71. (See *People v. Delgado* (2017) 2 Cal.5th 544, 573–574 ["We have long held that 'the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' "].) In this case, the trial court instructed the jury with CALJIC No. 17.40, which emphasizes that individual jurors should not "decide any question in a

particular way because a majority of the jurors or any of them favor that decision." And the jury was also instructed with CALJIC No. 8.74, which makes clear that the jury must "agree unanimously" as to the degree of murder before returning a verdict. We thus reject Gomez's claim.

### 2. CALJIC No. 17.41.1

Gomez argues that the trial court should not have instructed the jury with CALJIC No. 17.41.1 because doing so violated his federal constitutional rights. The instruction provided: "The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions. Accordingly should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation."

Gomez concedes that although we disapproved the use of CALJIC No. 17.41.1 in future trials in 2002 (see *People v. Engelman* (2002) 28 Cal.4th 436, 449), we have repeatedly held "that giving the instruction, although ill-advised, does not violate a defendant's constitutional rights" (*People v. Souza, supra,* 54 Cal.4th at p. 121; see also *People v. Nelson* (2016) 1 Cal.5th 513, 553–555; *People v. Brady* (2010) 50 Cal.4th 547, 587; *People v. Wilson* (2008) 44 Cal.4th 758, 805–806). Gomez provides no persuasive reason for us to revisit that precedent here.

*3. Series of Guilt Phase Instructions that Allegedly Undermine the Requirement of Proof Beyond a Reasonable Doubt*

Gomez contends that a series of standard guilt phase instructions (CALJIC Nos. 2.01, 2.21.2, 2.22, 2.27, 2.51, 8.20, 8.83) unconstitutionally undermined and diluted the requirement of proof beyond a reasonable doubt. Acknowledging that we have previously rejected such claims, Gomez invites us to reconsider our prior holdings. (See, e.g., *People v. Whalen* (2013) 56 Cal.4th 1, 70; *People v. Friend* (2009) 47 Cal.4th 1, 53; *People v. Howard* (2008) 42 Cal.4th 1000, 1024–1026.) We decline to do so. As we have explained, "[e]ach of these instructions 'is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof.'" (*People v. Kelly* (2007) 42 Cal.4th 763, 792, quoting *People v. Nakahara* (2003) 30 Cal.4th 705, 715.)

*4. Kidnapping Instruction*

The jury convicted Gomez of kidnapping Patel and found true the kidnapping special circumstance. Gomez argues that the trial court provided an erroneous instruction regarding the element of asportation, violating his constitutional rights to due process.

Section 207, subdivision (a) provides in relevant part: "[e]very person who forcibly . . . steals or takes, or holds, detains, or arrests any person in this state, and carries the person . . . into another part of the same county is guilty of kidnapping." (See *People v. Morgan* (2007) 42 Cal.4th 593, 605 (*Morgan*).) Although the kidnapping statute does not specify any minimum distance that the victim must be carried, we have

interpreted it to require movement of a "substantial distance" (*id.* at p. 606), not "a distance that is 'trivial'" (*People v. Stanworth* (1974) 11 Cal.3d 588, 601).

Before 1999, this "asportation standard [was] exclusively dependent on the distance involved." (*People v. Martinez* (1999) 20 Cal.4th 225, 233; see *People v. Caudillo* (1978) 21 Cal.3d 562, 572–574, overruled by *Martinez*, at p. 229.) But in *Martinez*, we held that the jury should instead consider the "totality of the circumstances" in determining whether the victim was moved for a "substantial distance," including factors like "whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Martinez*, at p. 237; see also *People v. Castaneda* (2011) 51 Cal.4th 1292, 1319.) We further held that the *Martinez* standard "could not be applied retroactively, because it effected an unforeseeable enlargement of the factual basis for determining what constitutes a 'substantial distance' under the kidnapping statute, and the defendant did not have fair warning of the enlargement." (*Castaneda*, at p. 1319.)

Although the kidnapping here occurred in 1997, the trial court instructed the jury with the 1999 version of CALJIC No. 9.50, which incorporates the *Martinez* asportation standard. As the Attorney General concedes, this was error. Nevertheless, we agree with the Attorney General that the error was harmless beyond a reasonable doubt. Whether Patel had been moved a substantial distance while he was alive was never in dispute at trial; the only disputed question was the identity of the kidnapper. After the close of evidence, the prosecutor "invite[d] the defense to concede that Patel was kidnapped so that you

don't have to spend any appreciable time on that issue. That would leave only the issue of who was the kidnapper for you to decide." In his argument, defense counsel said, "I will concede there was a robbery, I will concede it was a murder, and I will concede it was a kidnapping. . . . The issue, as I believe [the prosecutor] concedes himself, is whether or not [Gomez] is the person that committed the murder, committed a robbery and committed the kidnapping of Mr. Patel."

Moreover, defense counsel's concession was reasonable in light of the evidence: Patel had been locked in the trunk of his car, and his body was found on a freeway on-ramp that was not easily accessible on foot. The medical examiner testified that Patel would have been able to walk or run 75 to 90 feet after receiving the deep stab wound to his chest, but not after receiving the gunshot wound to his head; consistent with this testimony, the police found a trail of blood extending 75 feet from Patel's body, as well as spent shell casings as close as three feet from Patel's body and as far as 90 to 100 feet away from his body. In contrast, there is no evidence tending to show that Patel encountered his killer on the freeway on-ramp, as Gomez suggests. We thus conclude that the trial court's instructional error was harmless beyond a reasonable doubt.

### 5. *Alleged Vagueness of Definition of Simple Kidnapping*

As noted above, we have interpreted section 207 to require movement of a "substantial distance" (*Morgan, supra,* 42 Cal.4th at p. 606), not "a distance that is 'trivial' " (*id.* at p. 607). The jury here was thus instructed that, in order to find Gomez guilty of kidnapping, it must find that "[t]he movement of the other person in distance was substantial in character."

Gomez claims that this "substantial distance" element was unconstitutionally vague and thus warrants reversal of his conviction and sentence. Gomez admits that we rejected this precise argument in *Morgan*, and we do so again here. As we explained in *Morgan*, "case law in effect at the time of defendant's offense provided adequate guidance as to what distances would be considered 'substantial' under the simple kidnapping statute." (*Morgan*, *supra*, 42 Cal. 4th at p. 607, citing *People v. Caudillo* (1978) 21 Cal.3d 562, 573–574; *People v. Green* (1980) 27 Cal.3d 1, 67; *People v. Stender* (1975) 47 Cal.App.3d 413, 423.) Because Gomez "had fair notice of what was and what was not proscribed under our statute for simple kidnapping at the time of his offense," his vagueness claim fails. (*Morgan*, at p. 607.)

## IV.  PENALTY PHASE ISSUES

### A. Jury's Consideration of Evidence Relating to the Escareno Murder

After the close of the prosecution's case at the guilt phase, the defense moved to dismiss the Escareno charges for insufficient evidence and enter a judgment of acquittal pursuant to section 1181.1. The trial court denied the motion. After the jury deadlocked on the Escareno counts, the trial court declared a mistrial as to those counts. (The prosecution ultimately dismissed the Escareno counts at the conclusion of the trial. (See § 1385.))

Before the penalty phase closing arguments, the trial court told the jury that it wanted "to mention something special about counts 6 and 7, or 6 in particular, the allegation of the murder of Jesus Escareno. One thing I want to make clear to you in advance is that that is no longer one of the circumstances

of the crime." The trial court continued: "[T]hose jurors who concluded beyond a reasonable doubt that the defendant was guilty of the murder of Mr. Escareno are permitted to consider that as an aggravating factor under factor (b), prior acts of violence. The other jurors that did not find that to be true beyond a reasonable doubt cannot consider that as an aggravating factor. [¶] So as you discuss aggravating and mitigating circumstances, those of you that believe that the evidence established beyond a reasonable doubt that Mr. Gomez murdered Jesus Escareno can consider that as an aggravating factor. You cannot require or insist or suggest that jurors that did not reach that conclusion beyond a reasonable doubt can consider that as an aggravating factor." (See § 190.3, subd. (b).)

During his penalty phase closing argument, the prosecutor said: "I respectfully submit to you that in considering the circumstances of the crime that bear on what penalty [Gomez] should receive, look at the frequency with which he killed. He killed five people in 37 days. . . . [¶] You must agree unanimously on the penalty, but not on which aggravating circumstances are true. [¶] And therefore as the court already pointed out, for those of you who do not — did not believe that we proved Escareno's murder beyond a reasonable doubt, then you may not consider that he killed five people in 37 days, you are limited to considering that he killed four people in 37 days. Those of you who believe that we did prove Ruben Gomez murdered Jesus Escareno beyond a reasonable doubt, you may consider as an aggravating circumstance that he killed five people in 37 days." Defense counsel did not refer to the Escareno killing in his closing argument.

In its final written penalty phase instructions, the court instructed the jury: "Evidence has been introduced for the

purpose of showing that the defendant has committed the following criminal acts: [¶] . . . Murder of Mr. Escareno . . . Before a juror may consider any criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did, in fact, commit the criminal acts. A juror must — may not consider any evidence of any other criminal acts as an aggravating circumstance. [¶] It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that the criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose. [¶] As to the unadjudicated criminal acts [¶] . . . The defendant is presumed to be innocent until the contrary is proven beyond a reasonable doubt."

Gomez advances two claims arising out of the trial court's decision to permit individual jurors to consider evidence relating to the Escareno murder at the penalty phase. First, he claims the trial court erred in denying his section 1118.1 motion to dismiss the Escareno charges for insufficient evidence. If the trial court had properly granted that motion, Gomez argues, no jurors could have considered the Escareno evidence when determining whether to impose the death penalty. Second, he claims that the trial court erred in failing to instruct the penalty phase jurors that they could not consider the Escareno murder as an aggravating factor unless they found that the accomplice testimony was corroborated by independent evidence. We address each claim in turn.

## 1. *Denial of Section 1118.1 Motion*

Section 1118.1 provides that in a criminal jury trial, "the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged . . . if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." " 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' " (*People v. Stevens* (2007) 41 Cal.4th 182, 200, quoting *People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13.) We review the denial of a section 1181.1 motion de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213.)

Again, Gomez contends that the evidence was insufficient to support a conviction on the Escareno charges, such that no reasonable juror could have been convinced of the truth of such evidence beyond a reasonable doubt. In particular, Gomez argues that the prosecution failed to sufficiently corroborate the testimony of Witness No. 1, his alleged accomplice, which was the centerpiece of the prosecution's case as to the Escareno murder.

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the

commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." An "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*) In order for the jury to rely on an accomplice's testimony, " '[t]he corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime. The corroborating evidence need not by itself establish every element of the crime, but it must, without aid from the accomplice's testimony, tend to connect the defendant with the crime.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 505.)

It is undisputed that with respect to the Escareno murder, Witness No. 1 was an "accomplice" within the meaning of section 1111, and Witness No. 1's testimony identified Gomez as Escareno's killer. Thus, the only question is whether the prosecution presented to the jury sufficient corroborating evidence connecting Gomez with the Escareno murder.

Although the evidence of corroboration presented by the prosecution was not overwhelming, we find it sufficient for purposes of section 1118.1. The primary corroboration evidence presented at trial was Detective Winter's testimony indicating that Gomez knew details about the murder that were not public knowledge. Winter testified that after Gomez was arrested regarding the Acosta and Dunton murders, she questioned him at Harbor Jail about matters unrelated to the Escareno murder. According to Winter, Gomez then volunteered that he had heard "about a guy up on Western, his head being shot off, a female that had been killed and wrapped and disposed in a dumpster,

a couple of guys that were shot and brains were splattered all over the place and that these individuals couldn't be identified." Winter further testified that Gomez then said "that when he had talked about the individuals not being identified, their wallets were missing," although no information had yet been released to the press that Escareno's wallet had been stolen. This statement to Winter, the Attorney General argues, "corroborated [Witness No. 1's] testimony that [Gomez] killed Escareno." The Attorney General also identifies as corroborating evidence the fact that some of the victims of the other murders Gomez allegedly committed were also shot with a 12-gauge shotgun, and that all the alleged killings occurred in the same general area during a month-long period.

Gomez argues on appeal that the Winter statement is insufficient for our present purposes because Gomez did not specifically identify the Escareno murder when discussing the missing wallets; it is common knowledge that homicide victims are usually robbed; Witness No. 1 did not testify that he told Gomez he had taken Escareno's wallet; and the defense introduced evidence of newspaper articles indicating that it *was* public knowledge that the murder victim had no identification. But these arguments simply present one interpretation of the evidence; they do not suggest that it would be unreasonable to draw the opposite inference from the evidence, as the Attorney General urges. When reviewing whether "substantial evidence" supports the trial court's decision to allow individual jurors to consider the Escareno murder at the penalty phase, the "relevant inquiry . . . remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Towler, supra*, 31 Cal.3d at p. 118.) Gomez's alternative argument that the evidence was insufficient because

Witness No. 1 was not a credible witness similarly fails because "[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts." (*Young, supra*, 34 Cal.4th at p. 1181.)

Mindful of the standard of review here, we find that Winter's statement, along with the evidence regarding the similar murders, sufficiently corroborated Witness No. 1's testimony. The trial court did not err in denying Gomez's section 1118.1 motion as to the Escareno murder or in allowing jurors to consider that crime at the penalty phase on the limited basis it described.

## *2. Instructional Error*

Alternatively, Gomez claims that the trial court erred in failing to reinstruct the jurors at the penalty phase on the requirement that independent evidence must corroborate accomplice testimony. Gomez contends that this error was compounded by the trial court's admonition that the jurors should disregard guilt phase instructions that were not repeated at the penalty phase.

We have held that "the general rules requiring accomplice instructions apply at the penalty phase as well as the guilt phase of a capital trial." (*People v. Williams* (1997) 16 Cal.4th 153, 275; see *People v. Nelson* (2011) 51 Cal.4th 198, 217 ["The accomplice corroboration requirement applies to the penalty phase as well."].) Although the Attorney General does not dispute that the trial court failed to provide specific instructions concerning the accomplice corroboration requirement during the penalty phase, he nonetheless contends that this failure does not constitute error because the court "clearly told the jury [that] only those jurors who already found appellant guilty of the

Escareno murder at the guilt phase, necessarily based on the proper accomplice instructions given at the guilt phase, could consider these crimes as aggravating evidence."

We hold that any error was harmless here. (*Brown*, *supra*, 46 Cal.3d at pp. 447–448; *Chapman*, *supra*, 386 U.S. at p. 24.) Gomez argues that "[t]he Escareno murder was the single most aggravating circumstance relied on at the penalty phase." But the Escareno murder was just one of five murders offered as aggravation evidence at the penalty phase, and the jury had unanimously agreed that Gomez was guilty of four of those murders. Further, although Gomez contends that the details regarding the Escareno murder were especially prejudicial, the prosecutor did not focus on this incident in his closing argument; rather, he primarily discussed the Patel murder and Gomez's violent behavior against jail guards and other inmates. Moreover, both the prosecutor and the trial court told the jury that only those jurors who had found beyond a reasonable doubt that Gomez murdered Escareno could consider the Escareno murder as an aggravating factor. Finally, as discussed further above (see *ante*, at p. 68), the prosecution offered substantial evidence concerning other violent acts committed by Gomez, and the defense presented relatively little mitigation evidence. We find no reasonable possibility that the instructional error affected the jury's penalty determination.

## B. Admission of Evidence of Jail Guards' Ethnic Background

As noted, Deputy Sheriff Millan testified, as part of the prosecution's penalty phase case, that Gomez stabbed him with a shank while in custody. At the end of its direct examination, the prosecutor asked Millan, "What is your ancestry?" Millan

replied that he was "Mexican American." The prosecutor asked Deputy Sheriff Montoya the same question, who likewise responded that he was "Mexican American." During his penalty phase closing argument, the prosecutor said, "We've shown this man's history of past violence, and we've shown that this man's conduct while in custody is not the result of a racial or ethnic conduct, because his conduct, his violent behavior was not directed just at Vanderleek but also against Montoya and Millan, so that has nothing to do with it."

Gomez claims that the admission of evidence concerning the two jail guards' ethnic backgrounds allowed the jury to improperly consider race at the sentencing phase, thus violating his federal and state constitutional rights. By contrast, the Attorney General argues that the deputies' ancestry was relevant to Gomez's future dangerousness. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 53 [holding that a prosecutor may argue "that a defendant will be dangerous in the future based on evidence admitted under factors (a)-(c)" of section 190.3].) According to the Attorney General, "[t]he prosecutor in no way asked the jury to consider *appellant's* race to determine the penalty" but "merely argued that appellant was dangerous and would attack jail staff and inmates without regard to their race or ethnicity."

As the high court has said, the race of the defendant is "totally irrelevant to the sentencing process," and the jury's consideration of race as a factor in favor of the death penalty is "constitutionally impermissible." (*Zant v. Stephens* (1983) 462 U.S. 862, 885; see *People v. Bacigalupo* (1993) 6 Cal.4th 457, 477.) Similarly, "[t]he Constitution prohibits racially biased prosecutorial arguments." (*McCleskey v. Kemp* (1987) 481 U.S. 279, 309, fn. 30; see *People v. Cudjo* (1993) 6 Cal.4th 585, 625

(*Cudjo*) ["Prosecutorial argument that includes racial references appealing to or likely to incite racial prejudice violates the due process and equal protection guarantees of the Fourteenth Amendment to the federal Constitution."].)

We conclude that the trial court's admission of the evidence regarding the guards' ethnicities, as well as the prosecutor's argument relating to it, was improper. The Attorney General claims that the jury here was not asked to consider race because the prosecutor argued that Gomez lacked racial animus in attacking jail guards — that is, that Gomez attacked jail guards who shared his ethnic background as well as those who did not. But the prosecutor's argument nonetheless suggested that the jury could or should engage in the following race-based reasoning: Gomez posed a greater risk of future danger, and thus was more deserving of the death penalty, because he was willing to attack other Mexican Americans. Indeed, the objectionable implication of this line of argument is that the evidence concerning Gomez's jailhouse attacks would have been *less aggravating* if he had only attacked individuals who did not share his ethnicity. In any case, "[b]ecause racial prejudice can strongly compromise a juror's impartiality [citations], even neutral, nonderogatory references to race are improper absent compelling justification." (*Cudjo, supra*, 6 Cal.4th at pp. 625–626; see *McFarland v. Smith* (2d Cir. 1979) 611 F.2d 414, 417 ["To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended."]; *State v. Varner* (Minn. 2002) 643 N.W.2d 298, 305 ["Even statements

made without a biased intent may have a negative effect when it comes to issues of race."].)

Although we find no justification for the prosecutor's argument concerning the jail guards' ethnic backgrounds, we conclude that the admission of this evidence did not prejudice Gomez. As in *Cudjo*, the racial reference here "was a brief and isolated remark," and "there was no continued effort by the prosecutor to call attention to defendant's race or to prejudice the jury against him on account of race." (*Cudjo, supra*, 6 Cal.4th at p. 626.) Further, Gomez did not dispute the evidence establishing that he had violently attacked jail guards on numerous occasions, not to mention evidence of previous violent felony convictions. And, again, Gomez's mitigation evidence consisted solely of expert testimony regarding the security environment at high security state prisons and his sister's plea for mercy. We are thus persuaded that any error is harmless. (*Brown, supra*, at pp. 447–448; *Chapman, supra*, 386 U.S. at p. 24.)

## C. Instructional Error Concerning "Biblical References"

Immediately after the defense's penalty phase closing argument, the trial court gave the jury the following instruction: "I do want to emphasize again as I've done before that you're not to bring anything to the deliberation process. Jurors are sometimes tempted in this phase of the case to refer to biblical references. Don't bring the Bible and, don't refer to those. You'll be guided by your own conscience and the law." Gomez claims the trial court violated his federal constitutional rights by forbidding the jury from "referring to biblical references" when considering whether to impose the death sentence.

Gomez did not object to the instruction in the trial court. But, as the Attorney General acknowledges, the forfeiture rule "does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) Because that is what Gomez contends happened here, we turn to the merits of his claim.

" 'The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1219.) "That jurors may consider their religious beliefs during penalty deliberations," we have said, "is also to be expected." (*People v. Lewis* (2001) 26 Cal.4th 334, 389.) "At the penalty phase, jurors are asked to make a normative determination — one which necessarily includes moral and ethical considerations — designed to reflect community values." (*People v. Danks* (2004) 32 Cal.4th 269, 311 (*Danks*).) In sum, it is not improper for a juror to consider "personal religious, philosophical, or secular normative values" during penalty deliberations. (*Ibid.*)

At the same time, we have made clear that "[p]enalty determinations are to be based on the evidence presented by the parties and the legal instructions given by the court. . . . not by recourse to extraneous authority." (*People v. Sandoval* (1992) 4 Cal.4th 155, 194.) "[R]eliance on religious authority as supporting or opposing the death penalty" is thus impermissible. (*Ibid.*) Accordingly, we have held that "bringing biblical passages into the jury room and reading them aloud during deliberation constitutes misconduct." (*People v.*

*Williams* (2006) 40 Cal.4th 287, 333; *Danks*, *supra*, 32 Cal.4th at p. 308; *People v. Mincey* (1992) 2 Cal.4th 408, 466–467.)

Gomez admits that the court's instruction that jurors not "bring the Bible" into deliberations was correct. But he contends that the instructions went too far by forbidding jurors from even considering "biblical references," which erroneously suggested that jurors who "engaged in moral reasoning illustrated by or rooted in Biblical passages would be committing misconduct." Gomez argues the error is particularly prejudicial because it undermined the defense's closing argument emphasizing the moral decision before the jury, which counsel suggested would be "better expressed to you by a priest, a rabbi or a minister or even a philosopher."

The trial court's instructions are not a model of clarity. But we agree with the Attorney General that the court's prohibition on "refer[ing] to biblical references," understood in context, precluded only the use of biblical texts during deliberations; it did not preclude the jury from relying on personal religious beliefs. The instructions thus correctly stated the law.

" 'When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 677, quoting *People v. Wilson* (2008) 44 Cal.4th 758, 803–804.) The trial court's prohibition on "biblical references" followed its instruction that "you're not to bring anything to the deliberation process," suggesting that the jury understood the

instruction as a whole as forbidding extrinsic sources of law or evidence — of which biblical references were merely an example — during deliberations. This conclusion is supported by the trial court's statement that he wanted to "emphasize again as I've done before." The jury was likely to understand this statement as a reference to the court's guilt phase instruction that the jury "cannot refer to" "a religious text of some kind, a bible or something like that" because it is "outside information."

The court also gave a number of instructions that made clear that jurors could rely on their personal conscience and moral values when considering whether to impose the death penalty. Immediately after the challenged instruction, the trial court said: "You'll be guided by your own conscience and the law." The court later instructed the jury that "[a] mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." The court then said that, in weighing the aggravating and mitigating factors, "[y]ou are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the factors you are permitted to consider." Gomez argues that this general instruction concerning moral values did not cure the court's error in giving the specific instruction regarding biblical references. But that argument presupposes that the latter instruction referred to biblical *reasoning* instead of biblical texts, an argument we have rejected.

In any case, it is not reasonably likely that the jury understood the trial court's brief statement regarding "biblical references" to mean that they could not rely on their personal

religious beliefs during deliberations. We thus conclude that no instructional error occurred here. Nevertheless, we caution that trial courts, in prohibiting jurors from bringing religious texts to penalty phase deliberations, should be careful to ensure that they are not improperly interfering with the jurors' ability to consider their religious and other personal beliefs and values.

### D. Challenges to the Death Penalty

Gomez argues that a death sentence cannot be imposed unless the jury finds the defendant guilty "beyond all possible doubt." But, as Gomez acknowledges, we have previously rejected the argument that "evidence of guilt must be stronger in a capital case than in a noncapital case." (*People v. Lewis* (2009) 46 Cal.4th 1255, 1290, fn. 23.) He offers no compelling reason for us to revisit that conclusion.

We likewise reject Gomez's argument that his death sentence violates the Eighth Amendment because the robbery and special circumstances in this case permitted the jury to impose the sentence for an accidental or unforeseeable killing. As Gomez recognizes, we have "repeatedly held that, consistent with Eighth Amendment principles, neither intent to kill nor reckless indifference to life is a required element of the felony-murder special circumstance when the defendant is the actual killer." (*People v. Taylor* (2010) 48 Cal.4th 574, 661; see, e.g., *People v. Watkins* (2012) 55 Cal.4th 999, 1033; *People v. Martinez* (2010) 47 Cal.4th 911, 966–967; *Young, supra*, 34 Cal.4th at p. 1204.)

Gomez raises additional constitutional challenges to California's capital sentencing scheme, all of which we have previously considered and rejected. Gomez provides no

persuasive reason to revisit our decisions, and we thus reject his challenges in accordance with the following precedent:

We have held that section 190.2 " ' "adequately narrows the class of murderers subject to the death penalty" ' " and thus does not violate the Eighth Amendment. (*People v. Masters*, *supra*, 62 Cal.4th at p. 1077 (*Masters*); *People v. Cunningham* (2015) 61 Cal.4th 609, 671; *People v. Ramos* (2004) 34 Cal.4th 494, 532–533.)

Both this court and the high court have held that the current application of section 190.3, factor (a), is constitutional. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976; *People v. Johnson* (2016) 62 Cal.4th 600, 655; *People v. Rountree* (2013) 56 Cal.4th 823, 860.)

" 'Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty.' " (*People v. Williams* (2013) 58 Cal.4th 197, 295 (*Williams*); see *People v. Jackson* (2016) 1 Cal.5th 269, 373 (*Jackson*); *Masters*, *supra*, 62 Cal.4th at p. 1076; *People v. D'Arcy* (2010) 48 Cal.4th 257, 308.)

Likewise, " '[w]e have repeatedly held that "CALJIC No. 8.88 provides constitutionally sufficient guidance to the jury on the weighing of aggravating and mitigating factors." [Citations.] We have rejected the claim that the instruction unconstitutionally fails to inform the jury that, in order to impose the death penalty, it must find that aggravating

circumstances outweigh mitigating ones beyond a reasonable doubt. [Citation.] Under our precedent, "the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase." [Citation.]' " (*Masters*, *supra*, 62 Cal.4th at p. 1076; *People v. Peoples* (2016) 62 Cal.4th 718, 769–770; *Williams*, *supra*, 58 Cal.4th at p. 295.) We have also held "the phrase 'so substantial' [in CALJIC No. 8.88] is not impermissibly vague." (*People v. Lomax* (2010) 49 Cal.4th 530, 595; see *Jackson*, *supra*, 1 Cal.5th at p. 373.)

" 'Defendant was not entitled to an instruction regarding a presumption of life.' [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 150; see *Masters*, *supra*, 62 Cal.4th at p. 1078.)

" 'The use of certain adjectives such as "extreme" and "substantial" in the list of mitigating factors in section 190.3 does not render the statute unconstitutional.' " (*Jackson*, *supra*, 1 Cal.5th at pp. 372–373; *Masters*, *supra*, 62 Cal.4th at p. 1077; *People v. Carrasco* (2014) 59 Cal.4th 924, 971 (*Carrasco*).)

" 'CALJIC No. 8.85 is both correct and adequate.' [Citation] The sentencing factors set out in CALJIC No. 8.85 are not unconstitutionally vague or arbitrary, and the trial court is not required to delete inapplicable sentencing factors from the instruction." (*Jackson*, *supra*, 1 Cal.5th at p. 372, quoting *People v. Valencia* (2008) 43 Cal.4th 268, 309 and citing *People v. Famalaro* (2011) 52 Cal.4th 1, 43.)

We have held that a trial court may refuse to instruct the jury not to consider the deterrent or nondeterrent effect of the death penalty "where 'neither party raise[s] the issue of either the cost or the deterrent effect of the death penalty . . . .' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 371, quoting *People v. Brown* (2003) 31 Cal.4th 518, 566.)

"Neither intercase proportionality nor disparate sentence review is constitutionally compelled." (*Jackson, supra*, 1 Cal.5th at p. 373; *People v. Banks* (2014) 59 Cal.4th 1113, 1207; *People v. Eubanks* (2011) 53 Cal.4th 110, 154.) "Moreover, 'capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating' a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment." (*Carrasco, supra*, 59 Cal.4th at p. 971, quoting *People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

" 'The alleged inconsistency between regular imposition of the death penalty and international norms of human decency does not render that penalty cruel and unusual punishment under the Eighth Amendment [citation]; nor does "regular" imposition of the death penalty violate the Eighth Amendment on the ground that " '[i]nternational law is a part of our law' " [citation]. To the extent defendant contends the errors . . . that occurred at his trial also violate international law, his claim fails because we have found no such errors . . . . International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]' " (*Masters, supra*, 62 Cal.4th at pp. 1077–1078, quoting *People v. Lee* (2011) 51 Cal.4th 620, 654.)

### E. Cumulative Error

Gomez contends that the cumulative effect of the trial court's errors deprived him of his due process rights under the federal and state Constitutions and therefore warrant reversal. Although we have concluded that the trial court committed a number of harmless errors, we conclude there is no reasonable

possibility that these errors, considered cumulatively, affected the jury's verdicts.

## V.   CONCLUSION

We affirm the judgment.

LIU, J.

**We Concur:**
**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**LUI, J.**[*]

---

[*] Administrative Presiding Justice of the Court of Appeal, Second Appellate District, Division Two assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gomez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S087773
**Date Filed:** November 29, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** William R. Pounders

_____

**Counsel:**

Lynne S. Coffin and Laura S. Kelly, under appointments by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Laura S. Kelly
4521 Campus Drive, #175
Irvine, CA  92612
(949) 737-2042

David A. Voet
Deputy Attorney General
300 South Spring Street, Suite 1700
Los Angeles, CA  90013
(213) 576-1338